**GULF RESOURCES AMERICA et al., Plaintiffs,**

v.

**REPUBLIC OF CONGO, Defendant.**

**No. CIV.A. 98–2978(TPJ).**

United States District Court, District of Columbia.

July 29, 2003.

Stuart Henry Newberger, Crowell & Moring, L.L.P., Washington, DC, for plaintiffs.

Michael Robert Lazerwitz, Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for defendant.

## MEMORANDUM & ORDER

JACKSON, District Judge.

Plaintiff Gulf Resources Corp. ("Gulf") is a Panamanian corporation with its principal place of business in Beirut, Lebanon. Gulf is engaged in the international petroleum industry. Plaintiff Gulf Resources America ("Gulf America"), a wholly owned subsidiary of Gulf, is a Delaware corporation with principal places of business in Washington, D.C. and Los Angeles.

Defendant Republic of the Congo ("Congo") is a sovereign African nation. One of its principal natural resources is petroleum, and from time to time it enters into commercial transactions with private corporate entities for the production, distribution, and sale of its indigenous oil.[1]

This action arises out of a complex series of related bilateral agreements entered into by several parties, including Gulf and Congo, between April, 1993, and March, 1996, for the sale or exchange of Congo's "royalty oil."[2] Gulf alleges that Congo

---

1. The Republic of the Congo is sometimes identified with its capital, *i.e.* Congo–Brazzaville, to distinguish it from its neighbor, the Democratic Republic of the Congo, or Congo–Kinshasa, formerly known as Zaire.

2. Congo has negotiated arrangements with various international oil exploration and extraction companies by which Congo grants a company the right to extract petroleum from its territory in return for payment either in

stopped delivery of royalty oil (or the cash proceeds from its sale) destined for Gulf, causing Gulf to sustain significant business losses. Specifically, as a result of Congo's illegal conduct, Gulf alleges that in addition to its expected earnings from its commerce in Congo royalty oil, a potentially profitable merger transaction with an American oil company fell through. The complaint states claims for breach of contract, conversion, tortious interference with contract, tortious interference with business relationships, and in *quantum meruit*, seeking damages of $100 million from Congo. It also asks for an accounting of all of Congo's assets relating to the transactions at issue and injunctive relief requiring Congo to cease its unlawful embargo on Gulf's share of its royalty oil.[3]

Plaintiff Gulf asserts that this Court has jurisdiction of the case pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611 ("FSIA").[4] Congo has moved to dismiss the complaint on jurisdictional grounds pursuant to Fed. R.Civ.P. 12(b)(1) and (2) citing its sovereign immunity. Gulf opposes the motion, contending that Congo is not entitled to

immunity as a foreign sovereign state because Congo was engaged in commercial activity having direct effects in the United States. *See* 28 U.S.C. § 1605(a)(2). Gulf also argues Congo has waived any immunity to suit in the United States.[5] 28 U.S.C. § 1605(a)(1).

## I.

In somewhat simplified summary the complaint appears to allege as follows: in April, 1993, Occidental Congo, Inc. ("Occidental"), a U.S. corporation, entered into a purchase agreement ("Purchase Agreement") with Congo by which Congo sold 50 million barrels of royalty oil to Occidental for $150 million in cash and Occidental's promise of assistance for Congo's "structural adjustment program." The oil was to come from royalty oil produced from certain oil fields operated by Agip and Elf.[6] The agreement specifically declared it to be a commercial transaction governed by French law; that disputes would be submitted to arbitration in Paris under the rules of the International Chamber of Commerce; and that Congo would not use

---

cash or in kind, *i.e.*, a percentage of the petroleum extracted. The in-kind payments to Congo are referred to as "royalty oil" which Congo then sells for its own account.

3. Gulf America's interest in the royalty oil stems from an internal agreement between Gulf and Gulf America executed in late 1996. Since Gulf America's rights are entirely derivative, both plaintiffs are hereinafter referred to in the singular simply as "Gulf" or plaintiff.

4. The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Under the FSIA, a foreign state is presumed immune from suit in the U.S. unless one of certain enumerated exceptions applies. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct.

1471, 123 L.Ed.2d 47 (1993); *see also* 28 U.S.C. § 1604.

A foreign plaintiff, such as Gulf, may sue a foreign sovereign in a U.S. court, " 'provided the substantive requirements of the [FSIA] are satisfied.' " *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 489, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)).

5. Both Congo and Gulf have supplemented the motions record with declarations which the Court utilizes solely for the purpose of ascertaining the tenor and text of the relevant portions of the agreements at issue.

6. Agip is a subsidiary of the Italian conglomerate ENI SpA and Elf is a subsidiary of the French conglomerate Elf Aquitaine.

its foreign nation status as a defense to claims made by Occidental.

Congo and Occidental then amended their agreement in February, 1994 (the "Amendment") because Congo was in default on its obligations under the Purchase Agreement. In one article of the Amendment, the parties recited that in the interim Occidental and Gulf had agreed that Gulf would assume Occidental's undertaking with respect to Congo's structural adjustment program and authorized Occidental to assign to Gulf a right to a share of Occidental's royalty oil. Gulf was not a party to the Amendment. Four days later Occidental and Congo executed a "protocol" (the "Occidental Protocol") to clarify the distribution of royalty oil pursuant to the Amendment: They agreed that the Amendment would not operate to diminish the share of royalty oil Occidental had purchased. Occidental remained entitled to receive 50 million barrels *per* the Purchase Agreement, and in lieu of an assignment of a portion of Occidental's share Congo committed itself to sell Gulf a quantity of royalty oil over and above Occidental's entitlement.

On May 2, 1994, Congo and Gulf agreed in a separate document (the "Gulf–Congo Protocol") that Gulf would pay Congo $30 million in cash in exchange for 10 million barrels of royalty oil to which it claims it had acquired rights pursuant to the Amendment. (When Congo later realized that it could not deliver that quantity, Gulf and Congo agreed that Gulf would receive 5 million barrels of royalty oil in exchange for $15 million it had already paid to Congo on account.)

Rather than accept physical delivery of the Congo royalty oil, however, Occidental and Gulf agreed to sell the oil to Agip. In August, 1994, Occidental entered into an agreement with Agip, allegedly on both its and Gulf's behalf (the "Agip Sales Agreement"), by which Agip agreed to purchase 100% of all Congo royalty oil produced. Agip made payments for both Occidental's and Gulf's shares of the royalty oil to Occidental, depositing the money in Occidental's New York bank account from which Occidental then paid Gulf its share of the cash receipts.

In the meantime Gulf had begun merger discussions with a U.S. corporation, Clark USA, Inc. ("Clark"), a transaction valued by Gulf at approximately $26 million, consideration for which was to be linked to Gulf's purchases of Congo royalty oil. Gulf and Clark had negotiated an agreement under which a Gulf subsidiary would merge into Clark, and Gulf would receive a stock share interest in Clark in exchange for the proceeds from the sale of Gulf's Congo royalty oil. In December, 1995, Occidental and Gulf entered into a Disbursement Agreement by which Gulf directed Occidental to remit its share of the royalty oil payments by Agip directly to Clark, and Clark began receiving Gulf's share of the oil proceeds in January, 1996.

In summary, in separate agreements Congo had sold royalty oil to Occidental and Gulf. Occidental, on behalf of itself and Gulf, then sold all of the royalty oil to Agip, and Agip paid Occidental. Occidental then paid Gulf (later Clark) for Gulf's share of the proceeds. As a practical matter, no oil changed hands. Agip collected all of the royalty oil it extracted, paid Occidental for it, and Occidental then paid Gulf its portion.

For a short while the arrangement worked smoothly when yet another bilateral agreement between Congo and Occidental—an Accord and Satisfaction Agreement dated March 1, 1996—took effect. Under the Accord and Satisfaction, Congo bought back the oil it still owed Occidental pursuant to the Occidental Purchase Agreement. One article of this Accord

and Satisfaction expressly stated that it was to have no impact on any non-party, so Gulf contends that Gulf/ Clark's interest in payment for its share of the royalty oil remained unimpaired. However, in July, 1996, Agip stopped making *any* payments to Occidental, apparently in accordance with instructions from Congo to suspend all disbursements of royalty oil to Occidental. Occidental in turn, made no payments to Gulf/ Clark. Clark then demanded that Gulf dismantle their merger.

## II.

In moving to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and (2) Congo first argues that this Court has no subject matter jurisdiction over this case because Congo is immune from the jurisdiction of U.S. courts under the Foreign Sovereign Immunities Act. Under the FSIA, a foreign state is immune from suit in United States courts subject to certain exceptions. 28 U.S.C. § 1604. Gulf asserts jurisdiction based on the "commercial activity" exception. *See* 28 U.S.C. § 1605(a)(2). It also contends Congo has, expressly or by implication, waived its right to claim immunity. *See* 28 U.S.C. § 1605(a)(1).

Congo argues that the commercial activity exception does not apply because it was not required by any of its undertakings to perform any obligation or refrain from any action which had the requisite "direct effect" in this country, and that none of the agreements cited by the plaintiff explicitly or implicitly operate to effect a waiver of its statutory sovereign immunity to suit in U.S. courts. Finally, Congo argues that even if this Court has subject matter jurisdiction, it lacks personal jurisdiction because Gulf's complaint does not allege (nor does Gulf otherwise show) the "minimum contacts" by Congo with the United States required for an exercise of *in personam* jurisdiction over Congo by an American court, an argument which is now moot.[7]

## III.

*The Commercial Activity Exception*

■ Under the FSIA foreign nations relinquish their sovereign immunity to suit in U.S. courts when they engage in actionable conduct in the course of certain commercial (as distinguished from governmental) activity having some connection with the United States. The "commercial activity" exception, is set forth in 28 U.S.C. § 1605(a)(2):

> A foreign state shall not be immune from the jurisdiction of the United States or of the States in any case in

---

**7.** Until recently this case might have been susceptible to dismissal on Due Process grounds. Congo is not shown by this record to have any contacts with the U.S. other than diplomatic.

For over 20 years D.C. Circuit law held that the statutory requirements for acquiring personal jurisdiction over a foreign sovereign state under the FSIA did not obviate the necessity of establishing as well the "minimum contacts" between the defendant and the forum contemplated by the Due Process clause of the Fifth Amendment. *See Gilson v. Republic of Ireland,* 682 F.2d 1022, 1028 (D.C.Cir. 1982). The D.C. Circuit reiterated the proposition in *Foremost–McKesson, Inc., v. Islamic Republic of Iran,* 905 F.2d 438, 442 n. 10

(D.C.Cir.1990), and, notwithstanding the Supreme Court's intimation in *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) that a foreign sovereign might not be deemed a "person" for jurisdictional Due Process purposes, did so again in *Creighton, Ltd. v. Government of the State of Qatar,* 181 F.3d 118, 127–28 (D.C.Cir.1999).

In *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82 (D.C.Cir.2002), however, the D.C. Circuit took the step the Supreme Court elided in *Weltover* and held that a foreign nation does not possess and cannot invoke a Due Process right to evade the jurisdiction of a U.S. court on the ground that it has insufficient contacts with the forum.

which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Congo concedes that its sale of its royalty oil was "commercial activity" but observes that its allegedly wrongful conduct occurred entirely within its own borders. The parties agree therefore that the only relevant portion of the exception is the last clause: an act outside the U.S. in connection with a commercial activity of the foreign state elsewhere that causes a direct effect in the U.S.

Congo argues that plaintiff has failed to identify any direct effects its conduct may have had in the United States. The Supreme Court has held that a "direct effect" under § 1605(a)(2) is one that "follows 'as an immediate consequence of the defendant's ... activity.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). In *Weltover* the Supreme Court held that Argentina's default on certain bonds had a direct effect in the U.S. so as to subject Argentina to suit in the U.S. under the FSIA. The bondholders, two Panamanian corporations and a Swiss bank, had specified New York as the place where payment should be made, and when Argentina did not pay, they brought a breach of contract action in federal court. The Supreme Court found that New York was "the place of performance for Argentina's ultimate contractual obligations," so the rescheduling of those obligations "necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619, 112 S.Ct. 2160.[8]

Gulf argues that all that is needed is any non-trivial effect in the U.S. that is an "immediate consequence" of Congo's acts in connection with commercial activity elsewhere, citing, *e.g., Hanil Bank v. PT. Bank Negara Indonesia*, 148 F.3d 127 (2d Cir.1998) and *Voest–Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887 (5th Cir.1998). Gulf submits that there were a number of consequences it terms "immediate" of Congo's conduct with respect to the royalty oil contracts, the most damaging being vitiation of the Gulf–Clark merger. Without the royalty oil money, the merger was worthless. Nevertheless, Congo interrupted the flow of oil (or proceeds from its sale) to Gulf, thus breaching the Gulf–Congo Protocol and interfering with Gulf's contractual and business relationships with, Gulf America, Clark, Occidental, and Agip. Clark lost a significant interest in the Congo petroleum industry, Gulf lost its position as a major shareholder in Clark, and Gulf America lost its interest in the Gulf–Clark merger and related financial benefits. Both Gulf and Gulf America (a U.S. company) also suffered significant business losses both monetarily and to their reputations in the U.S. oil market because they were unable to fulfill their

---

**8.** Prior to *Weltover,* the D.C. Circuit required foreseeability for an effect to be direct. *See Maritime Int'l Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1111 (D.C.Cir.1982) (concluding that the financial effects on the U.S. company were fortuitous because the original agreement did not contemplate that the U.S. company would share in the profits). After *Weltover,* however, the only standard is whether the effects were an "immediate consequence," not whether they were "foreseeable." *See McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 351 (D.C.Cir.1995) (*"Weltover* changed the law by removing foreseeability and substantiality from consideration.").

contractual obligations with Clark, a leading U.S. oil company.

Whether or not "place of performance" is the sole determinant of the "immediacy" of a consequence of a foreign sovereign's breach of contract, most courts appear to consider it of paramount importance if the contract called for some "performance" in the United States. Numerous cases (all closely patterned on the facts in *Weltover*) have held that a sovereign state's failure to pay money due and owing in the U.S. is a "direct effect" sufficient to abrogate its sovereign immunity. *See Hanil Bank*, 148 F.3d at 127; *Voest–Alpine Trading USA Corp.*, 142 F.3d at 887; *Adler v. Federal Republic of Nigeria*, 107 F.3d 720 (9th Cir.1997); *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238 (2d Cir.1994); *c.f. McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 350 (D.C.Cir.1995).

Fewer cases are to be found in which commercial grievances with foreign states pleaded as commercial *torts* are analyzed on absence-of-direct-effect grounds. The leading case appears to be *Antares Aircraft v. Federal Republic of Nigeria*, 999 F.2d 33 (2d Cir.1993). In *Antares* plaintiff's sole asset was an airplane registered in Nigeria. After the Lagos airport authority refused to release the plane until outstanding fees and costs were paid, plaintiff sent payments to satisfy the delinquency from a New York bank account to Nigeria. The plane was subsequently released but had suffered physical damage as a result of exposure to the elements. Reconsidering the district court's dismissal of plaintiff's complaint upon remand from the Supreme Court "in light of [*Weltover*]," 999 F.2d at 34, the Second Circuit once

again affirmed the dismissal. It applied a "legally significant act" analysis, concluding that the Supreme Court's decision in *Weltover* had used a similar analysis. *Id.* at 36. The Second Circuit observed that all events determinative of liability and damage had occurred in Nigeria. That plaintiff's money came from a New York bank account was without significance to the alleged tort; the payment was overdue in Nigeria, and such injury as was done to the plane was suffered in Nigeria. *See id.* at 36 ("[T]he sole act connected to the United States in the instant matter, the drawing of a check on a bank in New York, was entirely fortuitous and entirely unrelated to the liability of the appellees.").[9]

Writing for himself and Circuit Judge Lumbard, Circuit Judge Winter's opinion in *Antares Aircraft* concluded:

Antares argues that a "direct effect" of the tort occurred in the United States because an American partnership suffered a financial loss. We are unpersuaded. To be sure, the detention of Antares' sole asset affected the financial well-being of the American partnership. However, the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception [citations omitted].

If a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states. Many commercial disputes, like the present one,

**9.** The D.C. Circuit has similarly found no "immediate consequence" in the U.S. resulting from an Iraqi bank's failure to make required payments on letters of credit to Irish companies *from* a U.S. bank account. *See Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1146–47 (D.C.Cir.1994). That previous payments were made from U.S. banks was seen as happenstance, neither contractually designated nor an alleged regular course of conduct, and the D.C. Circuit found no direct effects in the U.S.

can be pled as the torts of conversion or fraud and would, if appellant is correct, result in litigation concerning events with no connection with the United States other than the citizenship or place of incorporation of the plaintiff. Similarly, personal injury actions based on torts with no connection with this country, except for the plaintiff's citizenship, might be brought under appellant's theory. For example, an American citizen injured in a foreign city by a government-owned bus company might sue here if the commercial activity exception is triggered solely by the fact that the citizen's wealth is diminished by the accident. We find it difficult to characterize such an effect, standing alone, as "direct" or to read into this otherwise somewhat restrictive legislation an all-encompassing jurisdiction for foreign torts.

999 F.2d at 36–37. (Circuit Judge Altimari dissented).[10]

Congo observes that the locus of performance of each of the relevant contracts in this case, not only those by which Congo was bound, was specified to be elsewhere than in the U.S., save only for Agip's—not Congo's—agreement to make payments for the royalty oil it bought to Occidental's New York bank account. Congo made no agreements at all with anyone having anything to do with the United States, and Gulf's assignment of its rights to its wholly owned American subsidiary after Congo's alleged default on its oil deliveries to Gulf does not alter the analysis. Similarly, Congo's reneging on the delivery of Gulf's portion of royalty oil to Occidental—expropriation or conversion, however it may be termed in the language of tort—occurred

at dockside in Congo, nowhere else. The oil never left Congo. The "immediate consequence" of Congo's alleged wrongful conduct was that Agip took delivery of no royalty oil consigned to Gulf. Agip therefore made no payments to Occidental; Occidental made no payments to Gulf, and Gulf thus made none to Clark.

Congo argues that these latter consequences have no "direct effects" in the U.S. and that such remote effects as these alleged by Gulf were simply "ripples" of events commenced and concluded entirely overseas. The Court agrees.

Adverse impact alone on economic interests in the United States from an act or omission of a foreign state abroad in a commercial context is insufficient as a matter of law, in the opinion of this Court, to deprive the foreign state of its immunity under section 1605(a)(2) of the FSIA. At the least a plaintiff must allege that the foreign state itself breached a duty of its own to the plaintiff that involved an event in the U.S. The harm Gulf alleges here entails no more than an attenuation of plaintiff's business aspirations in the U.S. and elsewhere, and other courts have held that "mere financial loss by a person-individual or corporate-in the U.S. is not, in itself, sufficient to constitute a 'direct effect.'" *See Adler,* 107 F.3d at 726–27. Were it otherwise, as the Tenth Circuit has said, U.S. courts would presumably have jurisdiction "over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state." *See United World Trade, Inc. v.*

---

**10.** *But see Voest–Alpine Trading USA Corp. v. Bank of China,* 142 F.3d 887, 897 (5th Cir. 1998) ("[W]e hold that a financial loss incurred in the United States by an American plaintiff, if it is an immediate consequence of the defendant's activity, constitutes a direct effect sufficient to support jurisdiction under the third clause of the commercial activity exception to the FSIA.").

*Mangyshlakneft Oil Prod. Ass'n,* 33 F.3d 1232, 1239 (10th Cir.1994).

## IV.

*The Waiver Exception*

Section 1605(a)(1) of the FSIA provides that a foreign state shall not be immune in any case "in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).

■ Gulf contends that 28 U.S.C. § 1605(a)(1) does not require a formal instrument of waiver of sovereign immunity with a recitation of both the name of the beneficiary and an explicit submission to the jurisdiction of U.S. courts. It says that the waiver language used in the Occidental Purchase Agreement between Occidental and Congo is a sufficiently comprehensive surrender of Congo's sovereign rights and immunities in conjunction with the sale of its royalty oil to Gulf. If a formal instrument is necessary, it says Congo *has* explicitly waived its immunity under the "February 12, 1990 Treaty Between the United States of America and the People's Republic of the Congo Concerning the Reciprocal Encouragement and Protection of Investment." *See* Treaty of Reciprocal Encouragement and Protection of Investment, Feb. 12, 1990, U.S.—Congo, S. Treaty Doc. 102-1 (1991) (the "Treaty").

Turning first to the latter document, the Court observes that it provides that Congo will waive sovereign immunity if an "investment dispute" arises between "a Party [*i.e.,* Congo] and a national or company of the other party [*i.e.,* the United States]." Treaty, art. VI, S. Treaty Doc. 102-1 at 4-5. Under the Treaty, Congo

> consents to the submission of an investment dispute to the Centre [for the Settlement of Investment Disputes (ICSID)] for settlement by conciliation or binding arbitration, or, in the event the Centre is not available, to the submission of the dispute to ad hoc arbitration applying the rules of the Centre.

*Id.* at 5. According to Gulf the interest it acquired in Congo's royalty oil is an "investment" and its grievances with Congo are "disputes" subject to the provisions of the Treaty.

Congo replies that the Treaty does not apply to Gulf, and even if it did, the Treaty's only effect would be to offer Gulf the right to compel arbitration before the ICSID, not the right to proceed with its claims before this Court. Gulf has no rights under the Treaty because it is not a "national or company" of the U.S.; it is a Panamanian company with its principal place of business in Beirut. To the extent that Gulf claims through Gulf America, this contention fails as well, because Gulf America has no contractual relationship whatsoever with the Congo, and it can have no greater rights than those of its parent / assignor, namely, Gulf. Moreover, an agreement to submit future disputes to an international arbitral tribunal does represent an unequivocal submission under Section 1605(a)(1) to the jurisdiction of an American court. *See Maritime Int'l Nominees v. Republic of Guinea,* 693 F.2d 1094, 1102 (D.C.Cir.1982).

The Court agrees with Congo's position for all of the reasons cited. The Treaty affords no basis upon which this Court may assume jurisdiction to proceed with the case.

■ The cases appear to recognize three situations, however in which courts have found an implicit waiver of immunity from suit in the U.S. in the absence of an unequivocal expression of an intent to do so: (1) where the foreign sovereign has agreed to arbitration in the U.S. or has not specified where such arbitration should oc-

cur; (2) where the sovereign has agreed that U.S. law or the law of one of its states shall govern a contract; and (3) when the sovereign has filed a responsive pleading without raising its sovereign immunity as a defense.[11] *See Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1017 (2d Cir.1993); *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 377 (7th Cir.1985). All such waivers, however, are construed narrowly. *See Creighton, Ltd. v. Government of the State of Qatar,* 181 F.3d 118, 122 (D.C.Cir.1999); *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 444 (D.C.Cir.1990).

Two agreements between Congo *and Occidental*—not Gulf—(the Occidental Purchase Agreement and the Accord and Satisfaction Agreement) do include a limited waiver of Congo's sovereign immunity, but Congo argues that those provisions do not extend to Gulf and / or Gulf America. The immunity waiver in these agreements provides that Congo

> shall not, by legislative or executive act or proceeding, or otherwise, . . . (ii) contest or defend or assert defenses against (or permit any other person to contest, defend, or assert defenses against on the Government's behalf) claims, if any, made by Occidental, based in whole or in part upon the Government's status as a sovereign state, or (iii) in any manner avail itself of (or permit any other person to assert on the Government's behalf) any other benefits or protections of any nature whatsoever which might otherwise be available to the Government connected with the Government's status as a sovereign state in relation to this Agreement.

Purchase Agreement, Art. 10.1(j); Accord and Satisfaction Agreement, Art. 8.3(c)(ii).[12]

Congo contends that clause (ii) is a limited waiver of sovereign immunity that applies only to claims "made by Occidental," as the express language provides. Courts generally refuse to extend a waiver of immunity in a contract to suits by third parties who were not privy to the contract. *See Pere v. Nuovo Pignone, Inc.,* 150 F.3d 477, 482 (5th Cir.1998). Clause (iii) is, moreover, a catch-all provision applying to "benefits or protections" other than those addressed by clause (ii), namely, other than sovereign immunity, and is thus inapplicable to this case. *Cargill,* 991 F.2d at 1017; *Frolova,* 761 F.2d at 377.

Gulf then cites cases in which courts exercise jurisdiction where the contract at issue incorporates by reference a waiver in another contract and the contract sued upon does not itself contain the waiver language. *See Proyecfin de Venezuela. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390, 393 (2d Cir.1985); *Atwood Turn-*

---

**11.** Gulf submits Congo waived its sovereign immunity by failing to assert that defense in its first "pleading," a motion for an extension of time to answer. Congo responds that the motion for an extension of time is not a *responsive pleading.* The Court agrees. *See Canadian Overseas Ores Ltd. v. Compania De Acero Del Pacifico S.A.,* 727 F.2d 274 (2d Cir.1984); *see also Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990).

**12.** The Occidental Purchase Agreement also expressly provides that disputes arising thereunder are to be settled through arbitration in Paris in accordance with the arbitration rules of the International Chamber of Commerce. When the contract at issue specifically identifies a country other than the United States as providing the applicable law or a forum for arbitration, courts generally refuse to find a waiver of sovereign immunity from suit in U.S. courts. *See Frolova,* 761 F.2d at 377 ("[M]ost courts have refused to find an implicit waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States.").

*key Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1177 (5th Cir.1989). Both are factually distinguishable,[13] and the Gulf–Congo Protocol Agreement, while making reference to the Amendment to the Occidental Purchase Agreement, does not purport to incorporate any provisions of either agreement or amendment.

Gulf also argues that the interrelated nature of the contracts at issue would arguably support extension of the waiver even absent the express incorporation language. *See Trans–Bay Engineers & Builders, Inc. v. Hills*, 551 F.2d 370, 379 (D.C.Cir.1976) ("Where two or more written agreements are contemporaneously executed as part of one complete package, they should be construed together and should be construed as consistent with each other, even if not all the agreements are signed by the same parties."). In this case, the agreements were not signed contemporaneously and do not appear to have been perceived as a "complete package."

## V.

For the foregoing reasons the Court concludes that Congo retains its sovereign immunity to suit in this Court with respect to the claims made by Gulf in the instant complaint, and the motion to dismiss the complaint will be granted.

On December 21, 1998, this Court issued, under seal and *ex parte*, a writ of attachment before judgment of funds on deposit (or to be deposited) in a certain account with Chase Manhattan Bank, New York, New York, presumably to the credit of defendant Congo or a nominee. In view of the disposition made of Congo's motion to dismiss by the foregoing Memorandum, Gulf will be directed to show cause why the writ of attachment should not be quashed, and all documents on file with the Court relating thereto unsealed for all purposes.

It is, therefore, this 29th day of July, 2003,

ORDERED, that the motion of defendant The Republic of the Congo to dismiss the complaint is granted, and the complaint is dismissed without prejudice; and it is

FURTHER ORDERED, that plaintiffs Gulf Resources Corporation and Gulf Resources America show cause within thirty (30) days why the writ of attachment before judgment issued by this Court on December 21, 1998, and served upon Chase Manhattan Bank, New York, N.Y., attaching funds on deposit (or to be deposited) to the credit of Account No.

---

**13.** The two cases plaintiff cites in which a waiver of immunity in one contract constituted an "implied waiver" for purposes of another contract are quite different from the instant case. In *Proyecfin,* one contract contained an explicit waiver of sovereign immunity. A second agreement entered into contemporaneously by the same parties, contained a clause providing that the first contract " 'with all its exhibits is deemed to be totally reproduced herein and is considered as forming an integral part of this contract.' " The Second Circuit noted "[w]e further are persuaded by the fact that the related agreements were nearly contemporaneous and that there is an identity of parties to the two agreements." *Proyecfin,* 760 F.2d at 392–93.

In *Atwood,* a Brazilian petroleum company refused to pay an American company for work done in Brazil, and the American company sued to extend or reinstate the Brazilian company's letter of credit. The Fifth Circuit found that the Brazilian company had waived sovereign immunity pursuant to a financing agreement with an American bank and the Export Import Bank of the U.S. In the financing agreement, the Brazilian company "expressly and irrevocably" waived its sovereign immunity with respect to the "activities contemplated by the provisions of this agreement." *Atwood,* 875 F.2d at 1177.

011831435 should not be quashed, and all documents on file relating to the writ be unsealed, failing which the writ of attachment shall stand quashed, and the documents unsealed for all purposes; and it is

FURTHER ORDERED, that Gulf's motion to strike the declaration of Henri Lopes is denied as moot.