Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 13, 2004        Decided June 8, 2004

No. 03-7118

GULF RESOURCES AMERICA, INC. AND
GULF RESOURCES CORPORATION,
APPELLANTS

v.

REPUBLIC OF THE CONGO,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 98cv02978)

*Stuart H. Newberger* argued the cause for appellants. With him on the brief were *Clifton S. Elgarten*, *Dana C. Contratto*, and *Beth Nolan*.

*Michael R. Lazerwitz* argued the cause and filed the brief for appellee.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: EDWARDS, SENTELLE and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-1611 (2000), includes a provision pursuant to which foreign states may waive their sovereign immunity from suit in the courts of the United States. *See id.* § 1605(a)(1). This case involves the applicability of that provision to a contract dispute involving plaintiffs-appellants Gulf Resources Corporation ("Gulf"), a Panamanian corporation with its primary place of business in Beirut, Lebanon, and Gulf Resources America, Inc. ("Gulf America"), a wholly owned subsidiary of Gulf with its principal places of business in Washington, D.C. and Los Angeles, and defendant-appellee the Republic of the Congo ("Congo"). (Throughout this opinion, Gulf and Gulf America are referred to collectively as "Gulf" or "appellant.")

The dispute here arises out of the sale and resale of in-kind oil royalties owed to Congo by a subsidiary of an Italian oil conglomerate extracting oil from Congolese oil fields. At the heart of the dispute are several written agreements pursuant to which Congo sold certain of the royalty oil owed to Congo by the Italian producer to Gulf and Gulf's U.S. business partner. Acting through its business partner, Gulf agreed to sell the Congolese royalty oil back to the Italian producer at market prices. Gulf paid Congo in advance for the oil that it purchased. The Italian company was to pay Gulf as the oil was produced. When it had paid Gulf for just over a quarter of the oil that Gulf had purchased from Congo, the Italian producer, allegedly following instructions from Congo, redirected to Congo the payments due to Gulf. Thus, Gulf complains that Congo received payments owed to Gulf from the Italian producer. In essence, Gulf alleges that Congo received double payment for nearly three quarters of the royalty oil that Congo sold to Gulf: Congo was paid once in advance by Gulf and then again by the Italian producer.

Gulf filed suit in District Court alleging causes of action in contract and tort (including conversion and interference with contract) against Congo. Gulf sought damages and an ac-

counting. Congo moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) asserting sovereign immunity. Gulf argued that the District Court should exercise jurisdiction under FSIA's waiver provision, § 1605(a)(1), or under the second clause of the commercial activity exception, § 1605(a)(2). The District Court dismissed the complaint without prejudice, rejecting Gulf's several theories in support of its waiver argument, as well as its argument in support of a commercial activity exception. *Gulf Resources Am. v. Republic of Congo*, 276 F. Supp. 2d 20 (D.D.C. 2003).

We reverse the judgment of the District Court and remand the case for further proceedings. We find that Congo contractually waived sovereign immunity with respect to Gulf's claims in this case. Having waived sovereign immunity, Congo lost its immunity from jurisdiction pursuant to 28 U.S.C. § 1605(a)(1). In light of this finding, we need not address Gulf's contention that Congo also lost immunity under the commercial activity exception in FSIA.

## I. BACKGROUND

### A. The Original Purchase Agreement

In April 1993, a U.S. corporation, Occidental Congo Inc. ("Occidental"), signed a Purchase Agreement with Congo, pursuant to which Congo was to provide Occidental with 50 million barrels of "royalty oil" in exchange for $150 million and Occidental's assistance with an economic "structural adjustment program." Purchase Agreement (Apr. 28, 1993), *reprinted in* Joint Appendix ("J.A.") 119-35. Agip Recherches Congo ("Agip"), a subsidiary of Italian oil conglomerate ENI SpAaan, and Elf Congo S.A., a subsidiary of French conglomerate Elf Aquitaine, had previously agreed to pay the royalty oil to the Congo in exchange for the right to operate various Congolese oil fields. *See id.* Arts. 1.1-1.3, at 3-4, J.A. 121.

Several provisions of the Purchase Agreement are of particular relevance here. First, in Article 9, the parties explicitly contemplated Occidental's assignment of its oil interests. That provision states:

> Occidental shall have the right to assign ... its interest in this Agreement without first obtaining the approval of the Government provided that any assignment to a third party other than to an affiliate of Occidental shall require the prior written consent of the Government which consent shall not be unreasonably withheld. Any request for such consent shall state the main terms of such assignment. Any such assignment ... shall be promptly notified to the Government.

*Id*. Art. 9, at 8, J.A. 128. Second, the agreement contained an explicit acknowledgment that the transactions contemplated by it were commercial in nature. *Id*. Art. 10.1(j), at 10, J.A. 130. And it included an explicit waiver of sovereign immunity. *Id*. Finally, the agreement provided that all disputes which could not be resolved amicably would be settled through arbitration following the rules of the International Chamber of Commerce in Paris, France. *Id*. Art. 11.1, at 10, J.A. 130.

**B. Amendment of the Purchase Agreement**

In February 1994, Occidental and Congo amended the Purchase Agreement. Amendment to Purchase Agreement (Feb. 19, 1994) ("Amendment"), *reprinted* in J.A. 154-62. The Amendment accomplished a number of things. It provided that the royalty oil that Congo had agreed to provide to Occidental would come entirely from various Agip operations, eliminating Elf from the transaction. *Id*. Art. 2.1, at 1-2, J.A. 154-55. The Amendment referred to this newly designated oil as "substitute oil." *Id*. Arts. 1, 2.1, at 1-2, J.A. 154-55. More significantly, the Amendment contained a provision in which Congo "directed that Occidental assign to Gulf" the right to take a specified percentage of the royalty oil "under the Purchase Agreement...." *Id*. Art. 9.2, at 7-8, J.A. 160-61. The Amendment indicated that this assignment was a consequence of the fact that Occidental informed Congo that Gulf, as Occidental's joint venture partner, was to undertake the structural adjustment program that Occidental had

agreed to perform pursuant to the Purchase Agreement. *Id*. The Amendment also made clear that the waiver of sovereign immunity, contained in the Purchase Agreement, together with other warranty provisions, applied *mutatis mutandis* to the substitute oil. *Id*. Art. 6.2, at 6, J.A. 159.

### C.  Implementation of the Amended Purchase Agreement

Four days after the Amendment was signed, Congo and Occidental executed a one-page protocol, which stated: "Reference is made to the Amendment, dated 19 February 1994 (the 'Amendment'), to the Purchase Agreement dated April 28, 1993, between the Government and Occidental." Protocol (Feb. 23, 1994) (February Protocol), *reprinted in* J.A. 174-75. The Protocol clarified that, notwithstanding Article 9.2 of the Amendment (pursuant to which Congo "directed that Occidental assign to Gulf" the right to take a specified percentage of the royalty oil "under the Purchase Agreement"), Congo and Occidental agreed that the portion of the identified royalty oil delivered to Gulf would not be counted against the 50 million barrels that Congo had sold to Occidental. *See id*., J.A. 174. In addition to being signed by representatives of Congo and Occidental, the Chairman of Gulf indicated, by his signature, that Gulf had "received and approved" the document. *Id*., J.A. 175.

Several weeks later, on May 2, 1994, Congo and Gulf signed their own protocol pertaining to the assignment of royalty oil to Gulf. Protocol (May 5, 1994) (May Protocol), *reprinted in* J.A. 176-79. This protocol explicitly referred to the Purchase Agreement and Amendment signed by Congo and Occidental and specified that "[t]he terms used in this Protocol shall have the same meaning as defined in the Purchase Agreement as amended, modified and supplemented by the Amendment." *Id.* at 1, J.A. 176. The protocol first expressly acknowledged Occidental's assignment of rights to Gulf, as directed by Congo. *Id.* ¶1, at 1, J.A. 176. It then established that Gulf's rights under the assignment in the Amendment equaled 10 million barrels of oil for which Gulf was to pay Congo $30 million. *Id.* ¶¶1-2, at 1-2, J.A. 176-77. (Ap-

proximately seven months later, Congo and Gulf agreed to limit the sale to five million barrels for the first $15 million paid by Gulf. *See* Complaint ¶ 25, at 9, J.A. 33.)

Also on May 2, 1994, Congo, Occidental, and Gulf signed a letter agreement stating that Gulf would take over Occidental's obligations to advise Congo on a structural adjustment program. *Id.* ¶ 22, at 8, J.A. 32. In conjunction with the letter agreement, Congo and Gulf executed a Structural Adjustment Program Service Agreement stating "that Gulf would provide the Congo with some consulting services relating to the financial management and implementation of the Congo's structural adjustment program." *Id.* "The Congo directed Occidental to work out with Gulf any compensation due Gulf for Gulf's performance of Occidental's obligations under the structural adjustment program." *Id.* ¶ 23, at 9, J.A. 33.

**D. Agips' Purchase of the Royalty Oil**

Gulf's complaint alleges that Congo directed Agip to begin delivering royalty oil to Occidental and Gulf in August 1994. *Id.* ¶ 38, at 13, J.A. 37. It also alleges that before the first delivery was made, Occidental entered into an agreement on behalf of itself and Gulf pursuant to which Agip agreed to buy all of Occidental's and Gulf's shares of the Congo royalty oil at "the monthly per barrel official price ('prix fixe') for Congo oil. . . ." *Id.* ¶ 26, at 10, J.A. 34; *see also* Congo Crude Oil Sales Agreement ¶ 5 (Aug. 18, 1994) (Agip Purchase Agreement), *reprinted in* J.A. 180-84. Pursuant to the Agip Purchase Agreement, Agip made payments for the oil to a bank specified by Occidental. *Id.* ¶ 6, at 3, J.A. 182. According to the complaint, Agip was aware of Gulf's interest in the royalty oil that Agip was purchasing and purposely paid Occidental for Gulf's share of the oil. Complaint ¶¶ 27, 36, J.A. 34, 36; *see also* Memo from Pietro Cavanna, Senior Vice Pres., Agip (Nov. 22, 1994), *reprinted in* J.A. 185-86. The royalty oil owed to Occidental and Gulf was never physically separated from the rest of the oil produced by Agip. *See* Agip Purchase Agreement ¶ 1, at 1, J.A. 180. Thus, disposition of this

royalty oil was accomplished entirely as a bookkeeping matter. *See* Complaint ¶ 11, at 4-5, J.A. 29-30.

Some 15 months after the Agip Purchase Agreement was signed, Occidental and Gulf entered into an agreement regarding the disbursement of the proceeds from Agip's purchase of Gulf's royalty oil. Agreement and Direction Regarding Sales of Congo Royalty Oil and Disbursement of Proceeds (Dec. 1, 1995) (Disbursement Agreement), *reprinted in* J.A. 188-94; *see also* Complaint ¶ 36, at 12, J.A. 36. The Disbursement Agreement, which formalized the collection and disbursement arrangement between Occidental and Gulf, was necessitated by the fact that a Gulf subsidiary was merging with Clark USA, Inc. ("Clark"), a U.S. company. *See* Declaration of William C.F. Arnold, Pres., Gulf Resources Corporation, ¶ 27, at 11-12 (June 2, 1999), *reprinted in* J.A. 75-99. Before entering into the merger agreement with Clark, Gulf transferred to its subsidiary its interest in the outstanding proceeds from the sale of the royalty oil to Agip. *Id.* ¶ 23, at 9-10, J.A. 83-84. In exchange, Clark was to give to Gulf Clark stock. *Id.* In keeping with these arrangements, Gulf, through the Disbursement Agreement, directed Occidental to pay Gulf's share of the Agip royalty oil proceeds to Clark. Complaint ¶ 37, at 13, J.A. 37; Disbursement Agreement ¶ 2, at 2-3, J.A. 189-90. According to the complaint, Gulf representatives discussed the Gulf–Clark merger with the then-President of the Congo, who supported the merger. *Id.* ¶ 33, at 11, J.A. 35.

### E. Congo's Repurchase of Occidental's Royalty Oil and Ensuing Events

In March 1996, Congo and Occidental signed an accord and satisfaction whereby Congo paid $215 million to buy back Occidental's remaining rights to the 50 million barrels that Occidental purchased from Congo pursuant to the 1994 Purchase Agreement. Complaint ¶ 40, at 13-14, J.A. 37-38; Accord and Satisfaction Agreement (Mar. 1, 1996) (Accord and Satisfaction), *reprinted in* J.A. 195-205. In identifying the royalty oil subject to repurchase by Congo, the Accord and Satisfaction specifically excluded oil "assigned by Occidental

to a third party pursuant to Section 9.2 of Amendment No. 1 dated 19 February 1994, to the Purchase Agreement." *Id.* Art. 1.9, at 2, J.A. 196. Moreover, in a separate article titled "No Effect on Rights or Obligations of Third Parties," the Accord and Satisfaction referenced Article 9.2's assignment of oil to Gulf and stated that the assignment was not affected by the repurchase of Occidental's oil by Congo. Accord and Satisfaction Art. 7, at 6, J.A. 200; *see also* Complaint ¶ 42, at 14, J.A. 38. In other words, the Accord and Satisfaction did not alter the arrangement between Congo and Gulf or in any way diminish Gulf's interest in the royalty oil purchased from Congo. *See* Complaint ¶¶ 12, 43, at 5, 43, J.A. 29, 38.

The complaint alleges that in July 1996, several months after the execution of the Accord and Satisfaction, "Congo stopped delivery of Gulf and Clark's royalty oil." Complaint ¶ 39, at 13, J.A. 37. It elaborates: "Upon information and belief, Agip entered into an agreement with the Congo whereby the Congo directly sold the royalty oil to Agip." *Id.* ¶ 44, at 15, J.A. 39.

For purposes of its Rule 12(b)(1) motion, Congo did not dispute any of the facts alleged by Gulf, but argued only that the asserted facts were insufficient, as a matter of law, to abrogate Congo's sovereign immunity. Congo Br. at 3. The District Court agreed, finding that Congo retained its sovereign immunity to suit with respect to the claims made by Gulf. The District Court dismissed the complaint without prejudice and Gulf appealed.

## II.  Analysis

FSIA sets forth a comprehensive framework for determining when a federal or state court may exercise jurisdiction over a foreign state. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992). It authorizes " 'a foreign plaintiff to sue a foreign sovereign in the courts of the United States, provided the substantive requirements of the Act are satisfied. . . .' " *Id.* at 619 (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983)). And it grants federal

district courts subject matter jurisdiction over *in personam* civil claims with respect to which the defendant foreign state is not entitled to immunity under 28 U.S.C. §§ 1605-1607. 28 U.S.C. § 1330(a) (2000).

A district court order granting a Rule 12(b)(1) motion to dismiss on grounds of sovereign immunity is reviewed *de novo*. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 91 (D.C. Cir. 2002); *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1105 (D.C. Cir. 2001). " 'In accordance with the restrictive view of sovereign immunity reflected in FSIA,' the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (quoting *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985)). "If," as in this case, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the . . . court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting*, 216 F.3d at 40. Applying these standards, we hold that Gulf's allegations are sufficient to bring this case within the statutory exception to immunity under FSIA § 1605(a)(1).

## A. Article 10.1(j) of the Purchase Agreement Applies to Gulf

Section 1605(a)(1) provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the foreign state has waived its immunity either explicitly or by implication. . . ." 28 U.S.C. § 1605(a)(1). Congo does not dispute that Article 10.1(j) of the original Purchase Agreement contains an explicit waiver of sovereign immunity. Rather, Congo principally contends that this waiver does not apply to Gulf, because Gulf was not a party to the original Purchase Agreement. *See* Congo Br. at 28, 29-30. This argument fails.

It is true that Gulf was not a signatory to the original Purchase Agreement. However, under the 1994 Amendment, Gulf reached an explicit agreement with Congo for the purchase of royalty oil, the sale of which was clearly set within the framework of the original Purchase Agreement. In other words, pursuant to the 1994 Amendment, Gulf was incorporated into and made a beneficiary of and participant in the Purchase Agreement. This conclusion is inescapable on the record before us.

First, Congo and Occidental clearly anticipated the possible addition of new participants in the sale of the royalty oil and drafted the Purchase Agreement to allow for such additions. Indeed, the Purchase Agreement explicitly states that Occidental's rights are transferrable. Purchase Agreement Art. 9, at 8, J.A. 128. The anticipated addition of participants was realized in the 1994 Amendment when Congo "directed that Occidental assign to Gulf the right (a) to lift twenty five percent (25%) of the Royalty Oil under the Purchase Agreement . . . and (b) to receive seventy five percent (75%) of the royalties paid in cash to Occidental during the six months notice period for the election to take Royalty Oil in kind, as provided in Article 3.1 of this Amendment." Amendment Art. 9.2, at 8-9, J.A. 160-61. Moreover, the terms of the Amendment make it clear that the understandings reached therein were to be treated as part of the Purchase Agreement. Thus, the Amendment is entitled "Amendment to Purchase Agreement" and it plainly states that "the term 'Agreement' when used in the Purchase Agreement shall mean the Purchase Agreement as amended, modified and supplemented by this Amendment. . . ." *Id.* Art. 1, at 1, J.A. 154. Finally, the Amendment makes it clear that the waiver of sovereign immunity contained in Article 10.1(j) of the Purchase Agreement "shall apply *mutatis mutandis* to the Substitute Oil, the fields from which the Substitute Oil is produced, and the contracts, conventions, and establishment agreements applicable to such fields." *Id.* Art. 6.2, at 6, J.A. 159 (making all but two of the warranty provisions of the Purchase Agreement applicable, *mutatis mutandis*, to the substitute oil described in the Amendment).

The protocols implementing the amended Purchase Agreement contain no limitations suggesting that Gulf is not entitled to the full benefit of the amended Purchase Agreement. The first protocol, to which Gulf's Chairman affixed his signature as proof that Gulf had received and approved it, simply made clear that the oil Congo assigned to Gulf in the amended Purchase Agreement (a percentage of the royalty or substitute oil removed from specified fields) did not count against the total number of barrels that Occidental was entitled to collect under the Purchase Agreement. February Protocol, J.A. 174. The second protocol, signed by Gulf and Congo, established the total amount of oil, in barrels, to which Gulf was entitled as a result of its assigned right to collect a percentage of the royalty or substitute oil produced at the specified fields. May Protocol, ¶ 1, at 1, J.A. 176. It also set the total amount that Gulf owed Congo in consideration for that oil. *Id.* ¶ 2, at 1-2, J.A. 176-77.

Moreover, the protocols belie any suggestion that they are self-contained agreements separate from the amended Purchase Agreement. Both protocols introduce the substantive matters contained therein with an explicit reference the Amendment and the Purchase Agreement. February Protocol, J.A. 174; May Protocol, at 1, J.A. 176. In addition to referencing the preceding agreements, the second protocol states that "[t]he terms used in this Protocol shall have the same meaning as defined in the Purchase Agreement as amended, modified and supplemented by the Amendment." *Id*. at 1, J.A. 176. Finally, it is clear that the protocols would be devoid of content if read apart from the amended Purchase Agreement. This is because they do no more than paraphrase Article 9.2 of the Amendment – *i.e.*, the assignment article – and then simply clarify certain details regarding that assignment.

Additional and explicit confirmation of Gulf's status as a participant in and beneficiary of the amended Purchase Agreement is found in the Accord and Satisfaction pursuant to which Congo bought back the royalty oil purchased by Occidental. Article 7 of that agreement states:

> No provision of this Agreement shall be deemed or interpreted to apply to limit or affect the rights or obligations of any third parties with respect to agreements between such third parties and the Congo, including, without limitation, the third party referred to in Article 9.2 of Amendment No. 1 to the Purchase Agreement.

Accord and Satisfaction Art. 7, at 6, J.A. 200. Congo thus recognized that Gulf was a party with whom it had an agreement that was defined and memorialized in the amended Purchase Agreement.

## B. The Nature of the Waiver Provided by Article 10.1(j)

The various agreements at issue here make clear that Gulf is covered by the amended Purchase Agreement. The only remaining question is whether Gulf's claims fit within the contours of the waiver contained in Article 10.1(j) of the amended Purchase Agreement. They do.

Article 10.1(j) states:

> The transactions contemplated by this Agreement are commercial transactions, and the Government shall not, by legislative or executive act or proceeding, or otherwise, (i) take any action which would alter or impair the rights of Occidental under this Agreement, (ii) contest or defend or assert defenses against . . . claims, if any, made by Occidental, based in whole or in part upon the Government's status as a sovereign, or (iii) in any manner avail itself of . . . any other benefits or protections of any nature whatsoever which might otherwise be available to the Government connected with the Government's status as a sovereign state in relation to this Agreement.

Purchase Agreement Art. 10.1(j), at 10, J.A. 130. The parties agree that, under subsection (ii), Congo waived sovereign immunity with respect to Occidental. The dispute here turns on the meaning of subsection (iii). Gulf argues that the plain

terms of subsection (iii) cover Gulf's claims, because Gulf's claims against Congo arise "in relation to" the Purchase Agreement. Gulf Br. at 57-59; Reply Br. at 17-20. We agree.

Subsection (iii) contains a waiver of sovereign immunity, not, as Congo suggests, a waiver of some other, unspecified and unidentifiable, defense. We cannot imagine a "benefit[ ]" or "protection[ ]" that is "connected with [Congo's] *status as a sovereign state*" that is not an assertion of sovereign immunity. Indeed, that is precisely the meaning that Congo gives the phrase "the Government's status as a sovereign state" in subsection (ii). Congo Br. at 29. More significantly, Congo suggests no other "benefit[ ]" or "protection[ ]" that is "connected with the Government's status as a sovereign state" to which subsection (iii) might refer other than sovereign immunity.

Congo asserts that subsection (ii), which waives sovereign immunity with respect to Occidental, is superfluous if subsection (iii) waives sovereign immunity more generally. Consequently, Congo argues, subsection (iii) cannot be read as a waiver of Congo's sovereign immunity with respect to Gulf's claims here. Congo Br. at 34. This argument proves too much. Congo and Occidental were the original parties to the Purchase Agreement. Therefore, as Gulf argues, subsection (ii) logically, and not surprisingly, refers to these two parties alone. *See* Reply Br. at 20. However, as the original Purchase Agreement makes clear in explicitly providing for the assignment of Occidental's oil interests, Purchase Agreement Art. 9, at 8, J.A. 128, Congo and Occidental contemplated that other parties might later be brought into the Agreement. Subsection (iii) anticipates the addition of other investors, such as Gulf, to the arrangement and affords these other investors the same waiver of sovereign immunity given to Occidental in subsection (ii). As Gulf argues, one can view subsections (ii) and (iii) as covering, without overlap, two different groups – Occidental and the rest of the universe, respectively. Reply Br. at 19-20. In that case, subsection (ii) is not superfluous.

Even if subsection (ii) is seen as a subset of subsection (iii), this is not fatal to the extension of Congo's waiver to Gulf. Though the parties need not have written subsection (ii) as a subset of subsection (iii), a decision to do so in order to give the benefit of a waiver to contemplated but as yet unidentified participants in the purchase of Congo's royalty oil is plausible. Congo explicitly acknowledges that the transactions contemplated by the Purchase Agreement are "commercial." Purchase Agreement Art. 10.1(j), at 10, J.A. 130. This being the case, it is hard to imagine any business entity entering into a *commercial* agreement with a sovereign state for millions of dollars if the state is unwilling to make itself amenable to suit for breach of contract. In any event, the main point is that Congo's suggestion that subsection (iii) refers to defenses other than sovereign immunity is specious. Congo offers nothing to support this claim, the District Court found nothing, and we can think of nothing. Subsection (iii) must have meaning, and the only plausible meaning that has been offered is the interpretation pressed by Gulf.

Finally, Congo argues that Gulf will gain more than was given to Occidental under subsection (ii) if subsection (iii) is read as a waiver of sovereign immunity. In particular, Congo says that Occidental was required to arbitrate any disputes under the Purchase Agreement before the International Chamber of Commerce in France and that Gulf seeks to avoid this duty. *See* Congo Br. at 31. It is true that "most courts have refused to find an *implicit* waiver of immunity to suit in American courts from a contract clause providing for arbitration in a country other than the United States." *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir. 1985), *quoted in Creighton, Ltd. v. Gov't of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999) (emphasis added). But in those cases the relevant contract contained *only* an arbitration provision. There was not, as there is here, a separate, explicit waiver provision. Congo's position seems to be that the waiver provision should be read, in conjunction with the arbitration provision, as waiving immunity to suit only in France, but we reject that view for two reasons. First, unlike the arbitration provision, the waiver provision makes

no reference to any country, thus indicating a broader scope. Second, Congo's initial contract partner, Occidental, was an American company. We cannot accept that Congo never contemplated being sued in an American court even though it explicitly waived sovereign immunity in a contract that it signed with an American company. Our rejection of Congo's immunity claim does not, of course, address its argument that Gulf is bound by the Purchase Agreement's arbitration provision. Whether Gulf is obligated to arbitrate any claims against Congo under the amended Purchase Agreement is a matter the District Court can, in the first instance, resolve.

## III. Conclusion

For the foregoing reasons, the judgment of the District Court is reversed and the case remanded for further proceedings.