# VERLINDEN B. V. *v.* CENTRAL BANK OF NIGERIA

No. 81–920.   Argued January 11, 1983—Decided May 23, 1983

Burger, C. J., delivered the opinion for a unanimous Court.

*Abram Chayes* argued the cause for petitioner. With him on the briefs were *Berthold H. Hoeniger* and *Mitchell M. Bailey.*

*Deputy Solicitor General Bator* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Lee, Assistant Attorney General McGrath, Kenneth S. Geller* and *Stephen M. Shapiro,* Deputy Solicitors General, *William Kanter,* and *Eloise Davies.*

*Stephen N. Shulman,* by invitation of the Court, 459 U. S. 964, argued the cause as *amicus curiae* in support of the judgment below.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether the Foreign Sovereign Immunities Act of 1976, by authorizing a foreign plaintiff to sue a foreign state in a United States district court on a nonfederal cause of action, violates Article III of the Constitution.

## I

On April 21, 1975, the Federal Republic of Nigeria and petitioner Verlinden B. V., a Dutch corporation with its principal offices in Amsterdam, the Netherlands, entered into a contract providing for the purchase of 240,000 metric tons of cement by Nigeria. The parties agreed that the contract would be governed by the laws of the Netherlands and that disputes would be resolved by arbitration before the International Chamber of Commerce, Paris, France.

The contract provided that the Nigerian Government was to establish an irrevocable, confirmed letter of credit for the total purchase price through Slavenburg's Bank in Amsterdam. According to petitioner's amended complaint, however, respondent Central Bank of Nigeria, an instrumentality of Nigeria, improperly established an unconfirmed letter of credit payable through Morgan Guaranty Trust Co. in New York.[1]

---

*Briefs of *amici curiae* urging reversal were filed by *Lori Fisler Damrosch* and *Joseph McLaughlin* for the Committee on International Law of the Association of the Bar of the City of New York; and by *Monroe Leigh, Timothy B. Atkeson, Cecil J. Olmstead,* and *Stewart A. Baker* for the Rule of Law Committee et al.

A brief of *amicus curiae* urging affirmance was filed by *Stephen N. Shulman* and *Mark C. Ellenberg* for the Republic of Guinea.

[1] Morgan Guaranty acted solely as an advising bank; it undertook no independent responsibility for guaranteeing the letter of credit.

In August 1975, Verlinden subcontracted with a Liechtenstein corporation, Interbuco, to purchase the cement needed to fulfill the contract. Meanwhile, the ports of Nigeria had become clogged with hundreds of ships carrying cement, sent by numerous other cement suppliers with whom Nigeria also had entered into contracts.[2] In mid-September, Central Bank unilaterally directed its correspondent banks, including Morgan Guaranty, to adopt a series of amendments to all letters of credit issued in connection with the cement contracts. Central Bank also directly notified the suppliers that payment would be made only for those shipments approved by Central Bank two months before their arrival in Nigerian waters.[3]

Verlinden then sued Central Bank in the United States District Court for the Southern District of New York, alleging that Central Bank's actions constituted an anticipatory breach of the letter of credit. Verlinden alleged jurisdiction under the Foreign Sovereign Immunities Act, 28 U. S. C. § 1330.[4] Respondent moved to dismiss for, among other reasons, lack of subject-matter and personal jurisdiction.

---

[2] In 1975, Nigeria entered into 109 cement contracts with 68 suppliers. For a description of the general background of these events, see *Texas Trading & Milling Corp.* v. *Federal Republic of Nigeria,* 647 F. 2d 300, 303–306 (CA2 1981), cert. denied, 454 U. S. 1148 (1982). See also *Trendtex Trading Corp.* v. *Central Bank of Nigeria,* [1977] Q. B. 529.

[3] The parties do not seriously dispute the fact that these unilateral amendments constituted violations of Article 3 of the Uniform Customs and Practice for Documentary Credits (Int'l Chamber of Commerce Brochure No. 222) (1962 Revision), which, by stipulation of the parties, is applicable. See 488 F. Supp. 1284, 1288, and n. 5 (SDNY 1980).

[4] Title 28 U. S. C. § 1330 provides:

"(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

The District Court first held that a federal court may exercise subject-matter jurisdiction over a suit brought by a foreign corporation against a foreign sovereign. Although the legislative history of the Foreign Sovereign Immunities Act does not clearly reveal whether Congress intended the Act to extend to actions brought by foreign plaintiffs, Judge Weinfeld reasoned that the language of the Act is "broad and embracing. It confers jurisdiction over 'any nonjury civil action' against a foreign state." 488 F. Supp. 1284, 1292 (SDNY 1980). Moreover, in the District Court's view, allowing *all* actions against foreign sovereigns, including those initiated by foreign plaintiffs, to be brought in federal court was necessary to effectuate "the Congressional purpose of concentrating litigation against sovereign states in the federal courts in order to aid the development of a uniform body of federal law governing assertions of sovereign immunity." *Ibid.* The District Court also held that Art. III subject-matter jurisdiction extends to suits by foreign corporations against foreign sovereigns, stating:

> "[The Act] imposes a single, federal standard to be applied uniformly by both state and federal courts hearing claims brought against foreign states. In consequence, even though the plaintiff's claim is one grounded upon common law, the case is one that 'arises under' a federal law because the complaint compels the application of the uniform federal standard governing assertions of sovereign immunity. In short, the Immunities Act injects an essential federal element into all suits brought against foreign states." *Ibid.*

The District Court nevertheless dismissed the complaint, holding that a foreign instrumentality is entitled to sovereign immunity unless one of the exceptions specified in the Act ap-

---

"(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."

plies. After carefully considering each of the exceptions upon which petitioner relied, the District Court concluded that none applied, and accordingly dismissed the action.[5]

The Court of Appeals for the Second Circuit affirmed, but on different grounds. 647 F. 2d 320 (1981). The court agreed with the District Court that the Act was properly construed to permit actions brought by foreign plaintiffs. The court held, however, that the Act exceeded the scope of Art. III of the Constitution. In the view of the Court of Appeals, neither the Diversity Clause[6] nor the "Arising Under" Clause[7] of Art. III is broad enough to support jurisdiction over actions by foreign plaintiffs against foreign sovereigns; accordingly it concluded that Congress was without power to grant federal courts jurisdiction in this case, and affirmed the District Court's dismissal of the action.[8]

---

[5] The District Court dismissed "for lack of personal jurisdiction." Under the Act, however, both statutory subject-matter jurisdiction (otherwise known as "competence") and personal jurisdiction turn on application of the substantive provisions of the Act. Under § 1330(a), federal district courts are provided subject-matter jurisdiction if a foreign state is "not entitled to immunity either under sections 1605–1607 . . . or under any applicable international agreement"; § 1330(b) provides personal jurisdiction wherever subject-matter jurisdiction exists under subsection (a) and service of process has been made under 28 U. S. C. § 1608. Thus, if none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject-matter jurisdiction and personal jurisdiction. The District Court's conclusion that none of the exceptions to the Act applied therefore signified an absence of both competence and personal jurisdiction.

[6] The Foreign Diversity Clause provides that the judicial power extends "to Controversies . . . between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U. S. Const., Art. III, § 2, cl. 1.

[7] The so-called "Arising Under" Clause provides: "The judicial Power [of the United States] shall extend to all Cases . . . arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." *Ibid.*

[8] After the decision was announced, the United States moved for leave to intervene and for rehearing on the ground that the Court of Appeals had not complied with 28 U. S. C. § 2403, which requires that, in "any action"

We granted certiorari, 454 U. S. 1140 (1982), and we reverse and remand.

## II

For more than a century and a half, the United States generally granted foreign sovereigns complete immunity from suit in the courts of this country. In *The Schooner Exchange* v. *M'Faddon,* 7 Cranch 116 (1812), Chief Justice Marshall concluded that, while the jurisdiction of a nation within its own territory "is susceptible of no limitation not imposed by itself," *id.,* at 136, the United States had impliedly waived jurisdiction over certain activities of foreign sovereigns. Although the narrow holding of *The Schooner Exchange* was only that the courts of the United States lack jurisdiction over an armed ship of a foreign state found in our port, that opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns. See, *e. g., Berizzi Brothers Co.* v. *S.S. Pesaro,* 271 U. S. 562 (1926); Von Mehren, The Foreign Sovereign Immunities Act of 1976, 17 Colum. J. Transnat'l L. 33, 39–40 (1978).

As *The Schooner Exchange* made clear, however, foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution. Accordingly, this Court consistently has deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities. See, *e. g., Ex parte Peru,* 318 U. S. 578, 586–590 (1943); *Mexico* v. *Hoffman,* 324 U. S. 30, 33–36 (1945).

Until 1952, the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns.

---

in which "the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General." The Court of Appeals denied the motion without explanation, see App. to Pet. for Cert. 55a.

But in the so-called Tate Letter,[9] the State Department announced its adoption of the "restrictive" theory of foreign sovereign immunity. Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts.

The restrictive theory was not initially enacted into law, however, and its application proved troublesome. As in the past, initial responsibility for deciding questions of sovereign immunity fell primarily upon the Executive acting through the State Department, and the courts abided by "suggestions of immunity" from the State Department. As a consequence, foreign nations often placed diplomatic pressure on the State Department in seeking immunity. On occasion, political considerations led to suggestions of immunity in cases where immunity would not have been available under the restrictive theory.[10]

An additional complication was posed by the fact that foreign nations did not always make requests to the State Department. In such cases, the responsibility fell to the courts to determine whether sovereign immunity existed, generally by reference to prior State Department decisions. See generally Lowenfeld, Claims Against Foreign States—A Proposal for Reform of United States Law, 44 N. Y. U. L. Rev.

---

[9] Letter from Jack B. Tate, Acting Legal Adviser, Department of State, to Acting Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. of State Bull. 984–985 (1952), and in *Alfred Dunhill of London, Inc.* v. *Cuba*, 425 U. S. 682, 711 (1976) (Appendix 2 to opinion of WHITE, J.).

[10] See Testimony of Monroe Leigh, Legal Adviser, Department of State, Hearings on H. R. 11315 before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess., 34–35 (1976) (hereafter Hearings on H. R. 11315); Leigh, Sovereign Immunity—The Case of the "Imias," 68 Am. J. Int'l L. 280 (1974); Note, The Foreign Sovereign Immunities Act of 1976: Giving the Plaintiff His Day in Court, 46 Ford. L. Rev. 543, 548–549 (1977).

901, 909–912 (1969). Thus, sovereign immunity determinations were made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied. See, e. g., id., at 906–909; Weber, The Foreign Sovereign Immunities Act of 1976: Its Origin, Meaning and Effect, 3 Yale Studies in World Public Order 1, 11–13, 15–17 (1976).

In 1976, Congress passed the Foreign Sovereign Immunities Act in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to "assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process," H. R. Rep. No. 94–1487, p. 7 (1976). To accomplish these objectives, the Act contains a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.

For the most part, the Act codifies, as a matter of federal law, the restrictive theory of sovereign immunity. A foreign state is normally immune from the jurisdiction of federal and state courts, 28 U. S. C. § 1604, subject to a set of exceptions specified in §§ 1605 and 1607. Those exceptions include actions in which the foreign state has explicitly or impliedly waived its immunity, § 1605(a)(1), and actions based upon commercial activities of the foreign sovereign carried on in the United States or causing a direct effect in the United States, § 1605(a)(2).[11] When one of these or the other specified exceptions applies, "the foreign state shall be liable in

---

[11] The Act also contains exceptions for certain actions "in which rights in property taken in violation of international law are in issue," § 1605(a)(3); actions involving rights in real estate and in inherited and gift property located in the United States, § 1605(a)(4); actions for certain noncommercial torts within the United States, § 1605(a)(5); certain actions involving maritime liens, § 1605(b); and certain counterclaims, § 1607.

the same manner and to the same extent as a private individual under like circumstances," § 1606.[12]

The Act expressly provides that its standards control in "the courts of the United States and of the States," § 1604, and thus clearly contemplates that such suits may be brought in either federal or state courts. However, "[i]n view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area," H. R. Rep. No. 94–1487, *supra,* at 32, the Act guarantees foreign states the right to remove any civil action from a state court to a federal court, § 1441(d). The Act also provides that any claim permitted under the Act may be brought from the outset in federal court, § 1330(a).[13] If one of the specified exceptions to sovereign immunity applies, a federal district court may exercise subject-matter jurisdiction under § 1330(a); but if the claim does not fall within one of the exceptions, federal courts lack subject-matter jurisdiction.[14] In such a case, the foreign state is also ensured immunity from the jurisdiction of state courts by § 1604.

## III

The District Court and the Court of Appeals both held that the Foreign Sovereign Immunities Act purports to allow a foreign plaintiff to sue a foreign sovereign in the courts of the United States, provided the substantive requirements of the Act are satisfied. We agree.

On its face, the language of the statute is unambiguous. The statute grants jurisdiction over "any nonjury civil action against a foreign state . . . with respect to which the foreign

---

[12] Section 1606 somewhat modifies this standard of liability with respect to punitive damages and wrongful-death actions.

[13] "[T]o encourage the bringing of actions against foreign states in Federal courts," H. R. Rep. No. 94–1487, p. 13 (1976), the Act specifies that federal district courts shall have original jurisdiction "without regard to amount in controversy." § 1330(a).

[14] In such a situation, the federal court will also lack personal jurisdiction. See n. 5, *supra.*

state is not entitled to immunity," 28 U. S. C. § 1330(a). The Act contains no indication of any limitation based on the citizenship of the plaintiff.

The legislative history is less clear in this regard. The House Report recites that the Act would provide jurisdiction for *"any* claim with respect to which the foreign state is not entitled to immunity under sections 1605–1607," H. R. Rep. No. 94–1487, *supra,* at 13 (emphasis added), and also states that its purpose was "to provide when and how *parties* can maintain a lawsuit against a foreign state or its entities," *id.,* at 6 (emphasis added). At another point, however, the Report refers to the growing number of disputes between "American citizens" and foreign states, *id.,* at 6–7, and expresses the desire to ensure *"our citizens* . . . access to the courts," *id.,* at 6 (emphasis added).

Notwithstanding this reference to "our citizens," we conclude that, when considered as a whole, the legislative history reveals an intent not to limit jurisdiction under the Act to actions brought by American citizens. Congress was aware of concern that "our courts [might be] turned into small 'international courts of claims[,]' . . . open . . . to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world." Testimony of Bruno A. Ristau, Hearings on H. R. 11315, at 31. As the language of the statute reveals, Congress protected against this danger not by restricting the class of potential plaintiffs, but rather by enacting substantive provisions requiring some form of substantial contact with the United States. See 28 U. S. C. § 1605.[15] If an action satisfies the

---

[15] Section 1605(a)(1), which provides that sovereign immunity shall not apply if waived, may be seen as an exception to the normal pattern of the Act, which generally requires some form of contact with the United States. We need not decide whether, by waiving its immunity, a foreign state could consent to suit based on activities wholly unrelated to the United States. The Act does not appear to affect the traditional doctrine of *forum non conveniens.* See generally Kane, Suing Foreign Sovereigns: A Procedural Compass, 34 Stanford L. Rev. 385, 411–412 (1982); Note, Suits by

substantive standards of the Act, it may be brought in federal court regardless of the citizenship of the plaintiff.[16]

## IV

We now turn to the core question presented by this case: whether Congress exceeded the scope of Art. III of the Constitution by granting federal courts subject-matter jurisdiction over certain civil actions by foreign plaintiffs against foreign sovereigns where the rule of decision may be provided by state law.

This Court's cases firmly establish that Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution. See, e. g., *Hodgson* v. *Bowerbank*, 5 Cranch 303 (1809); *Kline* v. *Burke Construction Co.*, 260 U. S. 226, 234 (1922). Within Art. III of the Constitution, we find two sources authorizing the grant of jurisdiction in the Foreign Sovereign Immunities Act: the Diversity Clause and the "Arising Under" Clause.[17] The Diversity Clause, which provides that the judicial power extends to controversies between "a State, or the Citizens thereof, and foreign States," covers actions by citizens of

Foreigners Against Foreign States in United States Courts: A Selective Expansion of Jurisdiction, 90 Yale L. J. 1861, 1871–1873 (1981).

[16] Prior to passage of the Foreign Sovereign Immunities Act, which Congress clearly intended to govern all actions against foreign sovereigns, state courts on occasion had exercised jurisdiction over suits between foreign plaintiffs and foreign sovereigns, see, e. g., *J. Zeevi & Sons* v. *Grindlays Bank*, 37 N. Y. 2d 220, 333 N. E. 2d 168, cert. denied, 423 U. S. 866 (1975). Congress did not prohibit such actions when it enacted the Foreign Sovereign Immunities Act, but sought to ensure that any action that might be brought against a foreign sovereign in state court could also be brought in or removed to federal court. See *supra*, at 489.

[17] In view of our conclusion that proper actions by foreign plaintiffs under the Foreign Sovereign Immunities Act are within Art. III "arising under" jurisdiction, we need not consider petitioner's alternative argument that the Act is constitutional as an aspect of so-called "protective jurisdiction." See generally Note, The Theory of Protective Jurisdiction, 57 N. Y. U. L. Rev. 933 (1982).

States. Yet diversity jurisdiction is not sufficiently broad to support a grant of jurisdiction over actions by foreign plaintiffs, since a foreign plaintiff is not "a State, or [a] Citize[n] thereof." See *Mossman* v. *Higginson*, 4 Dall. 12 (1800).[18] We conclude, however, that the "Arising Under" Clause of Art. III provides an appropriate basis for the statutory grant of subject-matter jurisdiction to actions by foreign plaintiffs under the Act.

The controlling decision on the scope of Art. III "arising under" jurisdiction is Chief Justice Marshall's opinion for the Court in *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824). In *Osborn*, the Court upheld the constitutionality of a statute that granted the Bank of the United States the right to sue in federal court on causes of action based upon state law. There, the Court concluded that the "judicial department may receive . . . the power of construing every . . . law" that "the Legislature may constitutionally make," *id.*, at 818. The rule was laid down that

> "it [is] a sufficient foundation for jurisdiction, that the title or right set up by the party, may be defeated by one construction of the constitution or law[s] of the United States, and sustained by the opposite construction." *Id.*, at 822.

*Osborn* thus reflects a broad conception of "arising under" jurisdiction, according to which Congress may confer on the federal courts jurisdiction over any case or controversy that might call for the application of federal law. The breadth of that conclusion has been questioned. It has been observed that, taken at its broadest, *Osborn* might be read as permitting "assertion of original federal jurisdiction on the remote possibility of presentation of a federal question." *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 482 (1957) (Frank-

---

[18] Since Art. III requires only "minimal diversity," see *State Farm Fire & Casualty Co.* v. *Tashire*, 386 U. S. 523, 530 (1967), diversity jurisdiction would be a sufficient basis for jurisdiction where at least one of the plaintiffs is a citizen of a State.

furter, J., dissenting). See, *e. g.*, P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 866–867 (2d ed. 1973). We need not now resolve that issue or decide the precise boundaries of Art. III jurisdiction, however, since the present case does not involve a mere speculative possibility that a federal question may arise at some point in the proceeding. Rather, a suit against a foreign state under this Act necessarily raises questions of substantive federal law at the very outset, and hence clearly "arises under" federal law, as that term is used in Art. III.

By reason of its authority over foreign commerce and foreign relations, Congress has the undisputed power to decide, as a matter of federal law, whether and under what circumstances foreign nations should be amenable to suit in the United States. Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States, and the primacy of federal concerns is evident. See, *e. g.*, *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 423–425 (1964); *Zschernig* v. *Miller*, 389 U. S. 429, 440–441 (1968).

To promote these federal interests, Congress exercised its Art. I powers [19] by enacting a statute comprehensively regulating the amenability of foreign nations to suit in the United States. The statute must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity, 28 U. S. C. § 1330(a).[20] At the threshold of every ac-

---

[19] In enacting the legislation, Congress relied specifically on its powers to prescribe the jurisdiction of federal courts, Art. I, § 8, cl. 9; to define offenses against the "Law of Nations," Art. I, § 8, cl. 10; to regulate commerce with foreign nations, Art. I, § 8, cl. 3; and to make all laws necessary and proper to execute the Government's powers, Art. I, § 8, cl. 18.

[20] The House Report on the Act states that "sovereign immunity is an affirmative defense which must be specially pleaded," H. R. Rep. No. 94–1487, p. 17 (1976). Under the Act, however, subject-matter jurisdic-

tion in a district court against a foreign state, therefore, the court must satisfy itself that one of the exceptions applies—and in doing so it must apply the detailed federal law standards set forth in the Act. Accordingly, an action against a foreign sovereign arises under federal law, for purposes of Art. III jurisdiction.

In reaching a contrary conclusion, the Court of Appeals relied heavily upon decisions construing 28 U. S. C. § 1331, the statute which grants district courts general federal-question jurisdiction over any case that "arises under" the laws of the United States. The court placed particular emphasis on the so-called "well-pleaded complaint" rule, which provides, for purposes of *statutory* "arising under" jurisdiction, that the federal question must appear on the face of a well-pleaded complaint and may not enter in anticipation of a defense. See, *e. g.*, *Louisville & Nashville R. Co.* v. *Mottley*, 211 U. S. 149 (1908); *Gully* v. *First National Bank*, 299 U. S. 109 (1936); 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3562 (1975) (hereinafter Wright, Miller, & Cooper). In the view of the Court of Appeals, the question of foreign sovereign immunity in this case arose solely as a defense, and not on the face of Verlinden's well-pleaded complaint.

Although the language of § 1331 parallels that of the "Arising Under" Clause of Art. III, this Court never has held that statutory "arising under" jurisdiction is identical to Art. III "arising under" jurisdiction. Quite the contrary is true. Section 1331, the general federal-question statute, although broadly phrased,

> "has been continuously construed and limited in the light of the history that produced it, the demands of reason and coherence, and the dictates of sound judicial policy

---

tion turns on the existence of an exception to foreign sovereign immunity, 28 U. S. C. § 1330(a). Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a district court still must determine that immunity is unavailable under the Act.

which have emerged from the [statute's] function as a provision in the mosaic of federal judiciary legislation. *It is a statute, not a Constitution, we are expounding.*" *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 379 (1959) (emphasis added).

In an accompanying footnote, the Court further observed: "Of course the many limitations which have been placed on jurisdiction under § 1331 are not limitations on the constitutional power of Congress to confer jurisdiction on the federal courts." *Id.*, at 379, n. 51. We reiterated that conclusion in *Powell* v. *McCormack*, 395 U. S. 486, 515 (1969). See also *Shoshone Mining Co.* v. *Rutter*, 177 U. S. 505, 506 (1900). As these decisions make clear, Art. III "arising under" jurisdiction is broader than federal-question jurisdiction under § 1331, and the Court of Appeals' heavy reliance on decisions construing that statute was misplaced.[21]

In rejecting "arising under" jurisdiction, the Court of Appeals also noted that 28 U. S. C. § 1330 is a jurisdictional provision.[22] Because of this, the court felt its conclusion compelled by prior cases in which this Court has rejected con-

---

[21] Citing only *Shoshone Mining Co.* v. *Rutter*, 177 U. S. 505 (1900), the Court of Appeals recognized that this Court "has implied" that Art. III jurisdiction is broader than that under § 1331. The court nevertheless placed substantial reliance on decisions construing § 1331.

[22] Although a major function of the Foreign Service Immunities Act as a whole is to regulate jurisdiction of federal courts over cases involving foreign states, the Act's purpose is to set forth "comprehensive rules governing sovereign immunity." H. R. Rep. No. 94–1487, *supra*, at 12. The Act also prescribes procedures for commencing lawsuits against foreign states in federal and state courts and specifies the circumstances under which attachment and execution may be obtained against the property of foreign states. *Ibid.* In addition, the Act defines "Extent of Liability," setting out a general rule that the foreign sovereign is "liable in the same manner and to the same extent as a private individual," subject to certain specified exceptions, 28 U. S. C. § 1606. In view of our resolution of this case, we need not consider petitioner's claim that § 1606 itself renders every claim against a foreign sovereign a federal cause of action. See generally 13 Wright, Miller, & Cooper § 3563, at 418–419.

gressional attempts to confer jurisdiction on federal courts simply by enacting jurisdictional statutes. In *Mossman* v. *Higginson*, 4 Dall. 12 (1800), for example, this Court found that a statute purporting to confer jurisdiction over actions "where an alien is a party" would exceed the scope of Art. III if construed to allow an action solely between two aliens. And in *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, 451–453 (1852), the Court, while upholding a statute granting jurisdiction over vessels on the Great Lakes as an exercise of maritime jurisdiction, rejected the view that the jurisdictional statute itself constituted a federal regulation of commerce upon which "arising under" jurisdiction could be based.

From these cases, the Court of Appeals apparently concluded that a jurisdictional statute can never constitute the federal law under which the action arises, for Art. III purposes. Yet the statutes at issue in these prior cases sought to do nothing more than grant jurisdiction over a particular class of cases. As the Court stated in *The Propeller Genesee Chief:* "The law . . . contains no regulations of commerce . . . . *It merely confers a new jurisdiction on the district courts; and this is its only object and purpose.* . . . It is evident . . . that Congress, in passing [the law], did not intend to exercise their power to regulate commerce . . . ." 12 How., at 451–452 (emphasis added).

In contrast, in enacting the Foreign Sovereign Immunities Act, Congress expressly exercised its power to regulate foreign commerce, along with other specified Art. I powers. See n. 19, *supra.* As the House Report clearly indicates, the primary purpose of the Act was to "se[t] forth comprehensive rules governing sovereign immunity," H. R. Rep. No. 94–1487, p. 12 (1976); the jurisdictional provisions of the Act are simply one part of this comprehensive scheme. The Act thus does not merely concern access to the federal courts. Rather, it governs the types of actions for which foreign sov-

ereigns may be held liable in a court in the United States, federal or state. The Act codifies the standards governing foreign sovereign immunity as an aspect of substantive federal law, see *Ex parte Peru*, 318 U. S., at 588; *Mexico* v. *Hoffman*, 324 U. S., at 36; and applying those standards will generally require interpretation of numerous points of federal law. Finally, if a court determines that none of the exceptions to sovereign immunity applies, the plaintiff will be barred from raising his claim in any court in the United States—manifestly, "the title or right set up by the party, may be defeated by one construction of the . . . laws of the United States, and sustained by the opposite construction." *Osborn* v. *Bank of United States*, 9 Wheat., at 822. That the inquiry into foreign sovereign immunity is labeled under the Act as a matter of jurisdiction does not affect the constitutionality of Congress' action in granting federal courts jurisdiction over cases calling for application of this comprehensive regulatory statute.

Congress, pursuant to its unquestioned Art. I powers, has enacted a broad statutory framework governing assertions of foreign sovereign immunity. In so doing, Congress deliberately sought to channel cases against foreign sovereigns away from the state courts and into federal courts, thereby reducing the potential for a multiplicity of conflicting results among the courts of the 50 States. The resulting jurisdictional grant is within the bounds of Art. III, since every action against a foreign sovereign necessarily involves application of a body of substantive federal law, and accordingly "arises under" federal law, within the meaning of Art. III.

## V

A conclusion that the grant of jurisdiction in the Foreign Sovereign Immunities Act is consistent with the Constitution does not end the case. An action must not only satisfy Art. III but must also be supported by a statutory grant of subject-matter jurisdiction. As we have made clear, deciding

whether statutory subject-matter jurisdiction exists under the Foreign Sovereign Immunities Act entails an application of the substantive terms of the Act to determine whether one of the specified exceptions to immunity applies.

In the present case, the District Court, after satisfying itself as to the constitutionality of the Act, held that the present action does not fall within any specified exception. The Court of Appeals, reaching a contrary conclusion as to jurisdiction under the Constitution, did not find it necessary to address this statutory question.[23]   Accordingly, on remand the Court of Appeals must consider whether jurisdiction exists under the Act itself.   If the Court of Appeals agrees with the District Court on that issue, the case will be at an end.   If, on the other hand, the Court of Appeals concludes that jurisdiction does exist under the statute, the action may then be remanded to the District Court for further proceedings.

*It is so ordered.*

---

[23] In several related cases involving contracts between Nigeria and other cement suppliers, the Court of Appeals held that statutory subject-matter jurisdiction existed under the Act.   In those cases, the court held that Nigeria's acts were commercial in nature and "cause[d] a direct effect in the United States," within the meaning of 28 U. S. C. § 1605(a).   *Texas Trading & Milling Corp.* v. *Federal Republic of Nigeria,* 647 F. 2d, at 310–313.   Each of those actions involved a contract with an *American* supplier operating *within the United States,* however.   In the present case, the District Court found that exception inapplicable, concluding that the repudiation of the letter of credit "caused no direct, substantial, injurious effect in the United States."   488 F. Supp., at 1299–1300.