FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PACKSYS, S.A. DE C.V., a Mexican corporation,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>EXPORTADORA DE SAL, S.A. DE C.V., a Mexican corporation,<br>*Defendant-Appellee.* | No. 16-55380<br><br>D.C. No.<br>2:15-cv-09704-<br>JFW-AS<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted November 8, 2017
Pasadena, California

Filed August 15, 2018

Before:  Kim McLane Wardlaw and Andrew D. Hurwitz,[*] Circuit Judges, and Wiley Y. Daniel,[**] District Judge.

Opinion by Judge Wardlaw

## SUMMARY[***]

### Foreign Sovereign Immunities Act

Affirming the district court's dismissal of an action for lack of jurisdiction, the panel held that the Foreign Sovereign Immunities Act's commercial activity exception to immunity from suit did not apply.

The plaintiff alleged that a Mexican-government owned corporation breached a contract to sell the briny residue of its salt production process.  The corporation's Director General, who had entered into the contract, did not, in fact, have actual authority to execute the contract.  The panel held that the FSIA's commercial activity exception does not extend to embrace activities of a foreign agent having only apparent authority to engage in them.  The panel held that

[*] This case was submitted to a panel that included Judge Stephen Reinhardt.  Following Judge Reinhardt's death, Judge Hurwitz was drawn by lot to replace him.  Ninth Circuit General Order 3.2.h.  Judge Hurwitz has read the briefs, reviewed the record, and listened to oral argument.

[**] The Honorable Wiley Y. Daniel, United States District Judge for the U.S. District Court for Colorado, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the FSIA's waiver exception also did not apply because it, too, is subject to the same actual-authority requirement. Accordingly, the corporation properly invoked sovereign immunity.

## COUNSEL

Rory S. Miller (argued) and Andrew Baum, Glaser Weil Fink Howard Avchen & Shapiro LLP, Los Angeles, California, for Plaintiff-Appellant.

Steven J. Olson (argued), Catalina Vergara, J. Jorge deNeve, and Esteban Rodriguez, O'Melveny & Myers LLP, Los Angeles, California, for Defendant-Appellee.

## OPINION

WARDLAW, Circuit Judge:

It has been the law of our circuit for over two decades that the activities of an agent who lacks the actual authority of a foreign state do not constitute the conduct of that foreign state for purposes of the Foreign Sovereign Immunities Act's commercial activity exception to immunity from suit. *See* 28 U.S.C. § 1605(a)(2). Here the Director General of a Mexican government-owned corporation, Exportadora de Sal, S.A. de C.V. ("ESSA"), entered into a long-term, multi-million dollar contract with another Mexican corporation, Packsys, S.A. de C.V. ("Packsys"), to sell the briny residue from its salt production process. As it turned out, the Director General did not have actual authority to execute the contract, and when suit was filed in the United States, ESSA invoked sovereign immunity. Packsys, not having proof of

actual authority, asks us to create a new rule that would extend the commercial activity exception to embrace activities of a foreign agent having only apparent authority to engage in them. The district court declined to do so, and so do we. Nor do we accept that principles of ratification or waiver improve Packsys's position. We therefore affirm the district court's dismissal of this case for lack of jurisdiction.

## I.

Exportadora de Sal, S.A. de C.V., is a Mexican salt production corporation with its principal place of business at the Ojo de Liebre Lagoon on the west coast of Baja California Sur, Mexico.[1] ESSA, one of the world's largest producers of sea salt, is 51-percent owned by the government of Mexico. The other 49-percent ownership stake is held by Mitsubishi Corporation. The Mexican government appoints a majority of ESSA's board of directors, and the company's Director General—a position equivalent to CEO—is appointed by the President of Mexico.

ESSA produces sea salt using an evaporation method. Seawater is transferred from one pool to another, becoming more and more concentrated until salt begins to crystalize out of the water. At this point, the water is drained from the pool and the salt crystals are harvested. But the water that is drained from the collection pool—known as residual brine—contains high concentrations of chemicals and is potentially hazardous. What to do with this waste byproduct is thus a perpetual question for salt producers using this method of

---

[1] ESSA's amenability to suit in the United States is also at issue in *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. 16-56350, decided today. *Sea Breeze Salt* concerns the production and distribution of sea salt, while this case concerns the toxic residue left behind by the production process.

production.  ESSA historically dumped its residual brine back into the Ojo de Liebre Lagoon, but public pressure over environmental damage led it to stop this practice.  Since 1996, ESSA has stored its brine on land, at great and mounting expense.

At a meeting of ESSA's board on October 28, 2013, the company's then-Director General, Jorge Lopez Portillo Basave ("Portillo"), presented the board with a proposal that would turn this liability into an asset: several companies had inquired about purchasing ESSA's residual brine for further processing into valuable industrial chemicals.  At that meeting, the board passed Resolution 51, which approved Portillo's proposed "comprehensive commercialization scheme" for the brine.  Resolution 51 states, in translation:

> In keeping with Article 58(III) of the Federal Law on Government-Owned Entities, and due to the vital need to seek options for the use of the 17 million metric tons per year of residual brine originating from the process of producing sea salt, the approach is hereby approved for sales of residual brine in keeping with the criteria, factors, and alternatives presented for determination of sales prices on residual brine contained in the supporting report attached hereto as Annex 8.

> Furthermore, and as part of any marketable transactions of residual brine that may take place, the Director General is hereby authorized to provide, assign, or transfer the related studies, investigations, records, or reports, that are not exclusively earmarked

for use in the production process for natural
salt (NaCl).

The board did not set prices or approve any particular
contract for the sale of the brine.

In December 2013 or January 2014, Portillo executed a
contract for the sale of residual brine to Packsys, S.A. de
C.V., a Mexican corporation with its principal place of
business in Mexico. The contract fixes the price for the brine
at $4.00 USD or $6.50 USD per ton, depending on the
delivery site, and commits ESSA to sell at least ten million
tons of brine per year for at least forty years. It provides that
the brine will be delivered at one of two locations, both in
Mexico. And it contains the following "applicable law"
provision: "For the event of controversy, interpretation or
execution of the present agreement, the parties will subject
themselves to the applicable federal laws of the City of Los
Angeles California, thus renouncing to any other jurisdiction
that might apply by virtue of their future or present
domiciles." (as translated).

Portillo claims that he presented the executed contract to
ESSA's board at a February 25, 2014 board meeting, and
subsequently provided the board with additional updates on
the arrangement. But multiple ESSA board members
declared that the board never formally approved the contract,
and Portillo's declaration does not contradict these
statements.

Portillo was fired by ESSA's board in December 2014.
Beginning in 2015, ESSA refused to honor Packsys's
purchase orders for residual brine. And in September 2016,
Mexican newspaper *La Jornada* reported that Portillo had

been arrested by Mexican authorities for executing the residual brine contract without proper authority.[2]

Packsys sued ESSA in California state court on September 17, 2015, asserting breach of the long-term contract for brine that Portillo had executed. ESSA removed the action to the United States District Court for the Central District of California and moved to dismiss it under Federal Rule of Civil Procedure 12(b)(1), on the grounds that the suit was barred by the FSIA, that Mexico was a better forum under the doctrine of *forum non conveniens*, and that international comity required that the case be decided in Mexico.

The district court dismissed the action on foreign sovereign immunity grounds without reaching the other arguments. It held that because ESSA is a foreign state for FSIA purposes and Packsys's lawsuit does not fit into any of the FSIA's exceptions, ESSA is immune from suit in the United States. Packsys timely appealed.

## II.

In evaluating a district court's dismissal for lack of jurisdiction under the FSIA, "[w]e review the district court's legal rulings de novo and its factual findings for clear error." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1132 (9th Cir. 2012).

---

[2] ESSA's motion for judicial notice of this fact, is granted. We take notice of the fact of publication, but do not assume the truth of the article's contents. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

### III.

The Foreign Sovereign Immunities Act provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided" in the Act. 28 U.S.C. § 1604. Thus, the FSIA "shields foreign states and their agencies from suit in United States courts unless the suit falls within one of the Act's specifically enumerated exceptions." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 392 (2015).

It is undisputed that ESSA qualifies as a "foreign state" for FSIA purposes because it is 51-percent owned by the Mexican government. *See* 28 U.S.C. § 1603(a), (b) (defining "foreign state" to include "any entity . . . which is a separate legal person, corporate or otherwise, and . . . a majority of whose shares or other ownership interest is owned by a foreign state or other political subdivision thereof," with exceptions not relevant here). Indeed, we have already held, in a previous case, that ESSA is a foreign state under the FSIA. *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 779 n.1 (9th Cir. 1991). The dispute in this case is therefore limited to whether any of the FSIA's exceptions make ESSA subject to the jurisdiction of United States courts.

### A.  *The Burden of Proof*

Packsys argues that the district court improperly placed the burden of proof as to the applicability of the FSIA's exceptions on Packsys, rather than on ESSA. Packsys is incorrect.

A foreign defendant bears the initial burden to "make a prima facie case that it is a foreign state." *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1124 (9th Cir.

2010).**³** "Once the court has determined that the defendant is a foreign state, the burden of production shifts to the plaintiff to offer evidence that an exception applies." *Id.* at 1125 (internal quotation marks omitted). "If the plaintiff satisfies her burden of production, jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply." *Id.*

The district court correctly explained this burden-shifting framework in its opinion. But Packsys argues that, notwithstanding its recital of the correct standards, the district court actually placed the burden of proof on Packsys. Packsys bases this contention on the fact that "the district court repeatedly refers to Packsys's arguments and material cited before rejecting those arguments," as well as the district court's use of "phrases such as 'Packsys attempts to establish' and 'Packsys does not offer any evidence to the contrary.'"

But as ESSA rightly points out, the passages cited by Packsys are in portions of the district court's opinion in which it rejected Packsys's counterarguments, after the court had already concluded—presumably using the preponderance standard it had just articulated—that the

---

**³** Packsys argues that the defendant must also make a prima facie showing that the claim arises out of a sovereign act, but this is not correct. It is true that we have at times quoted language from older cases appearing to impose such a requirement. *See Terenkian*, 694 F.3d at 1131 (quoting *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 708 n.9 (9th Cir. 1992)). But the passing dicta in *Terenkian* could not overrule our explicit prior holding that "[r]equiring a foreign state to prove a public act conflicts with the plain language of the statute," and that therefore "the FSIA does not require the defendants to prove a public act to establish a prima facie case of immunity." *Phaneuf v. Republic of Indon.*, 106 F.3d 302, 306 (9th Cir. 1997).

FSIA exceptions did not apply.  When viewed in context, the phrases highlighted by Packsys do not betray any improper allocation of the relative burdens of proof, especially given the district court's explicit recital of the correct standards. *Cf. Reynoso v. Giurbino*, 462 F.3d 1099, 1119 (9th Cir. 2006) ("Such a happenstance does not constitute a basis for concluding that the court has applied the wrong standard.").

## B.  *The Commercial Activity Exception*

The FSIA's commercial activity exception provides that:

> A foreign state shall not be immune . . . in any case . . . in which the action is based
>
> > [1] upon a commercial activity carried on in the United States by the foreign state; or
> >
> > [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or
> >
> > [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  Packsys argues that the first and third clauses defeat ESSA's immunity here.  However, the exception—in all its various clauses—is inapplicable.

1.  Actual Authority

We have long held that the conduct of a foreign state's agent only triggers the commercial activity exception when the agent acts with the actual—as opposed to apparent—authority of the sovereign state. *Phaneuf v. Republic of Indon.*, 106 F.3d 302, 307–08 (9th Cir. 1997). As we explained in *Phaneuf*, "[a]ll three clauses of the [FSIA's commercial activity] exception require 'a commercial activity *of the foreign state*.'" *Id.* at 307 (quoting 28 U.S.C. § 1605(a)(2)). But "[w]hen an agent acts beyond the scope of his authority, . . . that agent is not doing business which the sovereign has empowered him to do," and "the agent's unauthorized act [therefore] cannot be attributed to the foreign state." *Id.* at 308 (internal quotation marks omitted). That is, acts undertaken without actual authority are not acts "of the foreign state," 28 U.S.C. § 1605(a)(2), regardless of whether the agent appeared to have the authorization of the sovereign. We left little doubt in our holding: "[A]n agent must have acted with actual authority in order to invoke the commercial activity exception against a foreign state." *Phaneuf*, 106 F.3d at 308.

The district court correctly concluded that Portillo lacked actual authority to enter the contract with Packsys on behalf of ESSA, and therefore held that Packsys could not invoke the commercial activity exception. Mexican law provides that only ESSA's board may set prices for its products. Because ESSA is a government-owned entity, it is subject to Mexico's Federal Law on State-Owned Entities (Ley Federal de las Entidades Paraestatales, or "LFEP"). And Article 58(III) of the LFEP provides that "[t]he governing bodies of parastatal entities" shall have the authority "[t]o fix and adjust the prices of the goods and services that the parastatal entity produces or provides," and that this

authority "may not be delegated." Diario Oficial de la Federación [DOF] 14-05-1986, últimas reformas DOF 18-12-2015.**[4]**

Moreover, ESSA's internal policies require a board resolution supported by a six-vote supermajority to enter a contract that will have a duration greater than two years. The same rule applies to contracts for the sale of goods worth more than $2 million USD.

The contract with Packsys meets all three conditions for requiring a board resolution: it fixes a price for residual brine; it has a duration of at least forty years; and it provides for the sale of goods of at least $40 million per year—ten million tons multiplied by $4.00 per ton. Therefore, as the district court held, the Packsys contract required board approval under both Mexican federal law and ESSA's internal policies. And it is undisputed that the board never voted on or explicitly approved the Packsys contract either before or after its execution. Portillo therefore lacked actual authority to enter the contract.

Nor did the ESSA board's Article 51, which approved a general "approach . . . for sales of residual brine" provide Portillo with actual authority to execute the Packsys contract. Packsys does not really argue in its briefing that Article 51—or anything else, for that matter—empowered Portillo to make the contract on ESSA's behalf. Instead, it contends only that ESSA failed to carry its burden of disproving actual authority by a preponderance of the evidence. But ESSA submitted to the district court

---

**[4]** ESSA's expert on Mexican law states that the purpose of these oversight provisions is to combat corruption and cronyism in government contracting.

declarations from three ESSA board members and one substitute board member stating that the board never gave Portillo authority to enter the Packsys contract, either through Article 51 or otherwise.  And, as the district court found, even Portillo's "artfully worded declaration . . . never states that the Board approved the Contract with Packsys, or that Resolution 51 fixed or set the actual price of residual brine."  Furthermore, any disagreement between the parties' Mexican-law experts is not over the effect of Resolution 51, but over whether Mexican law requires board approval in the first place—which is a question of law for the court, not a fact that ESSA was required to prove.  Fed. R. Civ. P. 44.1 ("The court's determination [of foreign law] must be treated as a ruling on a question of law.").  *See generally de Fontbrune v. Wofsy*, 838 F.3d 992, 996–1000 (9th Cir. 2016).  The district court correctly concluded that ESSA had met its burden.[5]

### 2.  Distinguishing *Phaneuf*

Much of Packsys's brief is devoted to an argument that attempts to distinguish *Phaneuf*'s clear holding that acts

---

[5] Packsys has submitted, pursuant to Fed. R. App. P. 28(j), confidential materials in a Mexican arbitration between ESSA and an unrelated third party.  Packsys claims that the materials establish that Portillo had actual authority to enter the Packsys contract.  We disagree. First, the materials are not an appropriate subject of a Rule 28(j) letter. "Rule 28(j) permits a party to bring new *authorities* to the attention of the court; it is not designed to bring new evidence through the back door."  *Manley v. Rowley*, 847 F.3d 705, 710 n.2 (9th Cir. 2017) (quoting *Trans-Sterling, Inc. v. Bible*, 804 F.2d 525, 528 (9th Cir. 1986)).  And even if we were to construe these materials as legal authority rather than new evidence, and therefore a proper subject of a Rule 28(j) letter, the contract at issue in the arbitration does not share the key characteristic that renders the Packsys contract ultra vires under Mexican law: the fixing of prices without board approval.  *See supra*.

undertaken with apparent—but not actual—authority are insufficient to trigger the FSIA's commercial activity exception. The core of Packsys's argument is that *Phaneuf*'s actual-authority requirement should apply only to what it calls public and sovereign, as opposed to private and commercial, acts. We are not persuaded.

Prior to the enactment of the FSIA, courts generally "deferred to the decisions of the political branches . . . on whether to take jurisdiction over actions against foreign sovereigns." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 821 (2018) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)). The traditional position of the State Department was that foreign sovereigns were absolutely immune. *Id.* "But, as foreign states became more involved in commercial activity in the United States, the State Department recognized that such participation 'makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts.'" *Id.* at 821–22 (quoting J. Tate, Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments, 26 Dept. State Bull. 984, 985 (1952)). Thus, in 1952 the State Department adopted the so-called restrictive theory of sovereign immunity, which "recognized immunity for public acts, that is to say, acts of a governmental nature typically performed by a foreign state, but not for acts of a private nature even though undertaken by a foreign state." *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1026 (9th Cir. 2010) (en banc). As Packsys notes, the FSIA "codifies, as a matter of federal law, the restrictive theory of sovereign immunity." *Verlinden*, 461 U.S. at 488.

Packsys thus argues that "Congress specifically intended to enshrine into law the notion that sovereign immunity ends where private commercial conduct begins when it enacted

the FSIA." True enough. But Congress did so by enacting 28 U.S.C. §§ 1605–1607, which "outline the only exceptions to the Act." *Phaneuf*, 106 F.3d at 306; *see also, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). That is, Packsys's attempt to read a public/private distinction into the commercial activity exception must be rejected because the text of § 1605(a)(2) is *itself* Congress's instantiation of the public/private principle.[6] Now that Congress has acted, the relevant version of the restrictive theory is the one enshrined in the text. *See Samantar v. Yousuf*, 560 U.S. 305, 313 (2010) ("After the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity.").

And there is nothing in the text that supports Packsys's proposed distinction with respect to the requirement of actual authority. We hinted at no such distinction when we concluded in *Phaneuf* that "the plain meaning of the language 'commercial activity of the foreign state' [in 28 U.S.C. § 1605(a)(2)] illustrates that Congress intended for the exception to apply only in cases of actual authority." *Phaneuf*, 106 F.3d at 308. Our reasoning similarly does not admit of the purported distinction: "If the foreign state has not empowered its agent to act, the agent's unauthorized act cannot be attributed to the foreign state; there is no 'activity of the foreign state.'" *Id.* (quoting 28 U.S.C. § 1605(a)(2)).

---

[6] Indeed, a House Report on the FSIA specifically describes "a public act of the foreign state" as "an act *not within the exceptions* in sections 1605–1607." H.R. Rep. No. 94-1487, at 17 (1976) (emphasis added).

That conclusion applies with equal force regardless of the commercial or noncommercial character of the act in question.

Moreover, one of the "principal purposes" of the FSIA counsels against reading an unstated proviso into the commercial activity exception. *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004). The FSIA was, at least in part, a "respon[se] to the inconsistent application of sovereign immunity" that resulted from reliance on executive branch involvement. *Samantar*, 560 U.S. at 313. By codifying the practice, Congress sought to replace with clear, predictable rules the "ambiguous . . . 'standards'" under which sovereign immunity decisions were previously made. *Altmann*, 541 U.S. at 699. Layering an additional, atextual public/private principle on top of the one that Congress actually enacted would "hardly further[] Congress' purpose of 'clarifying the rules that judges should apply in resolving sovereign immunity claims.'" *Samantar*, 560 U.S. at 322 (quoting *Altmann*, 541 U.S. at 699).

No circuit court has adopted the public/private distinction Packsys advances. And, only one district court decision, *Themis Capital, LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508 (S.D.N.Y. 2012), has opined that "it does not appear to be the case that apparent authority is inadequate where private acts of a sovereign are at issue." *Id.* at 525. But that court was bound by Second Circuit authority holding that apparent authority is sufficient in general to trigger the FSIA commercial activity exception. *See First Fid. Bank, N.A. v. Gov't of Ant. & Barb.— Permanent Mission*, 877 F.2d 189, 194 (2d Cir. 1989). In *Phaneuf*, we explicitly declined to follow the Second

Circuit's *First Fidelity* decision. 106 F.3d at 308 n.4.**[7]** Just as the district court in *Themis Capital* was bound by *First Fidelity*, we are bound by *Phaneuf*.

Finally, Packsys points to the "absurd and unjust result" that would obtain if its distinction were rejected: "a *caveat emptor* situation for any individual doing business with a state-owned enterprise." But we rejected just such an argument in *Phaneuf*, when we drew from principles of United States sovereign immunity to inform our FSIA holding. As we noted, "[w]hen dealing with a purported agent of the United States, the third party bears the risk that the agent is acting outside the scope of the agent's authority, even if the third party reasonably believes the agent has authority." *Phaneuf*, 106 F.3d at 308 (citation omitted). Indeed, it is the nature of immunity that some otherwise meritorious claims will not be allowed to proceed.**[8]** We

---

**[7]** Most circuits to have considered the issue have adopted *Phaneuf*'s actual authority rule. *See Dale v. Colagiovanni*, 443 F.3d 425, 429 (5th Cir. 2006) ("We agree with the Fourth and Ninth Circuits that an agent's acts conducted with the apparent authority of the state is insufficient to trigger the commercial exception to FSIA."); *Velasco v. Gov't of Indon.*, 370 F.3d 392, 400 (4th Cir. 2004) ("[W]e concur with the position of the Ninth Circuit and hold that the commercial activity exception may be invoked against a foreign state only when its officials have actual authority."); *see also Allfreight Worldwide Cargo, Inc. v. Ethiopian Airlines Enter.*, 307 F. App'x 721, 724–25 (4th Cir. 2009) (per curiam) (applying actual authority rule to conduct that would be "private" under Packsys's propose rule). *But see Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1226–27 (11th Cir. 2018).

**[8]** And perhaps Packsys's reliance on Portillo's apparent authority was not so reasonable. It too is a Mexican corporation, and its complaint alleges that ESSA is state-owned. Presumably it was on notice that the contract required board approval under Mexican law because Portillo could not fix or adjust prices on his own, or even by delegation.

decline to adopt Packsys's proposed public/private distinction with respect to the *Phaneuf* rule.

### 3. Ratification

Packsys argues that the commercial activity exception should apply for a separate reason: even if executing the contract was beyond Portillo's actual authority, ESSA's subsequent acts ratified the agreement. The district court rejected this theory on the basis that (a) only actual authority can trigger the commercial activity exception under *Phaneuf*, and (b) in any case, none of the actions cited by Packsys could constitute ratification.[9]

Assuming without deciding that ratification could form the basis for application of the commercial activity exception, Packsys's argument fails. Under Mexican law and ESSA's policies, only an explicit board resolution could approve the Packsys contract. No resolution ratifying the contract was passed. Thus, any acts by individual officers or board members that purportedly show ratification would themselves have been ultra vires and therefore cannot satisfy the commercial activity exception under *Phaneuf*. *See Velasco*, 370 F.3d at 402 (rejecting a ratification argument under the commercial activity exception because "Velasco has failed to offer any evidence that any Indonesian official

---

[9] The actions Packsys argues show ratification include board members' non-objection when Portillo presented updates on the contract; a dinner party attended by ESSA and Packsys executives, purportedly in celebration of the contract; and subsequent meetings and shipment of residual brine samples.

with actual authority to issue the notes . . . manifested an intention to ratify the notes").**10**

---

**10** The commercial activity exception is also inapplicable for a second, independent reason: the conduct underlying this lawsuit is insufficiently connected to the United States to satisfy any of the three clauses of the exception.  The first clause cannot apply because the "gravamen" of this suit is conduct that allegedly occurred in Mexico—that is, the breach of a contract, between two Mexican entities, for the sale of goods to be delivered in Mexico.  *See Sachs*, 136 S. Ct. at 396 ("[A]n action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit.").  The action is therefore not "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2) (first clause).

For the same reason, this suit is not based upon "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."  28 U.S.C. § 1605(a)(2) (second clause).  The gravamen is conduct in Mexico, not an act performed in the United States.

Nor is this suit "based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere . . . that causes a direct effect in the United States," 28 U.S.C. § 1605(a)(2) (third clause), because the requisite "direct effect" is lacking. *See Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).  In *Terenkian*, which was also a breach-of-contract case, we held that—at least where the plaintiff had not yet entered into resale contracts with particular U.S. buyers at the time of breach—"non-sales of . . . non-purchased oil to potential customers in the United States[] do not constitute direct effects."  694 F.3d at 1138.  *Terenkian* is directly on point here, where the claimed direct effects are Packsys's "non-sales of the non-purchased" residual brine to not-yet-identified potential American buyers.  *Id.*; *see also id.* at 1133 (distinguishing *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661 (D.C. Cir. 2010), because the third-party agreements in that case "either had been finalized, or were final but for the signature" and thus the

## C. The Waiver Exception

Packsys also argues that the FSIA's waiver exception defeats ESSA's claim of sovereign immunity. That exception provides that "[a] foreign state shall not be immune . . . in any case . . . in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). "[I]t is clear that a sovereign party has waived immunity where a contract specifically states that the laws of a jurisdiction within the United States are to govern the transaction." *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1022 (9th Cir. 1987) (emphasis omitted). Packsys maintains that, because the contract specifies "the applicable federal laws of the City of Los Angeles California" as governing, ESSA has waived its sovereign immunity.

But the waiver argument suffers from the same defect as the commercial activity argument: Portillo lacked actual authority to enter the contract, and the contractual choice of law provision—and the resulting waiver—is therefore not attributable to ESSA.[11] We have not yet had occasion to extend *Phaneuf*'s actual-authority requirement from the commercial activity exception to the waiver exception, but *Phaneuf*'s reasoning applies in the waiver context with at least equal force. Both exceptions are triggered only by an act of "the foreign state." *Compare* 28 U.S.C. § 1605(a)(2) (requiring "commercial activity of the foreign state"), *with*

---

foreign nation's breach "led inexorably to the loss of revenues under the third-party agreements").

[11] It is also a nonsensical provision: the City of Los Angeles does not enact federal laws; nor would federal law govern this simple breach of contract action. It is difficult to know just what the drafters of the contract meant by this clause.

28 U.S.C. § 1605(a)(1) (allowing suit where "the foreign state has waived its immunity"). If acts by unauthorized agents do not constitute "activity *of* the foreign state," under Section 1605(a)(2), they also cannot effect a waiver *by* "the foreign state" under Section 1605(a)(1).

Indeed, a requirement of actual authority is all the more justified in the waiver context, "given that a waiver of sovereign immunity speaks directly to the foreign sovereign's willingness to accede to the jurisdiction of another country's courts." *SACE S.p.A. v. Republic of Para.*, 243 F. Supp. 3d 21, 36 (D.D.C. 2017) (concluding that actual authority is required to invoke the FSIA's waiver exception); s*ee also Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996) (noting that "[t]he waiver exception is narrowly construed," and "courts rarely find that a nation has waived its sovereign immunity without *strong evidence* that this is what the foreign state *intended*" (quoting *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 287 (5th Cir. 1993))).

We hold that the FSIA's waiver exception is subject to the same actual-authority requirement as the commercial activity exception. Packsys's apparent-authority and ratification arguments therefore fail, and ESSA is immune from suit under the FSIA.

**IV.**

Packsys contends that the district court abused its discretion by denying its request for jurisdictional discovery. Because of the "delicate balance between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or a sovereign agency's legitimate claim to immunity from discovery," jurisdictional discovery in FSIA cases "should

be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F.3d 1078, 1088 (9th Cir. 1999) (quoting *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176 (2d Cir. 1998)), *opinion withdrawn on other grounds*, 237 F.3d 1007 (9th Cir. 2001).

Packsys's request for jurisdictional discovery did not identify any "specific facts crucial to an immunity determination" that it wished to verify. And the district court did not rely on disputed facts in reaching its holding; instead, it relied on the undisputed fact that no board resolution authorizing the Packsys contract ever issued. That is, the district court did not reject Packsys's jurisdictional allegations—it merely determined that they were not relevant, since none of them could overcome the lack of an express board resolution. Thus, the district court did not abuse its discretion by denying jurisdictional discovery. *Cf. Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) ("The denial of Boschetto's request for discovery, which was based on little more than a hunch that it might yield jurisdictionally relevant facts, was not an abuse of discretion.").

## V.

Mexican law required ESSA's board to authorize or approve the Packsys contract, but the board did not do so. Portillo therefore lacked actual authority to execute the contract. And because the contract was not executed with actual authority, it cannot serve as the basis for applying either the FSIA's commercial activity exception or its waiver

exception under *Phaneuf*.  The district court correctly concluded that the FSIA bars this suit.

**AFFIRMED.**